### CARDINAL HEALTH 414, INC., Plaintiff,

v.

**Daniel ADAMS, Allen B. Townsend, Jr., and Mid–South Nuclear Pharmacy, Inc., d/b/a Music City Nuclear Pharmacy, Defendants.**

Case No. 3:07–00691.

United States District Court, M.D. Tennessee, Nashville Division.

Oct. 10, 2008.

Chandra N.T. Flint, Gerald David Neenan, A. Scott Ross, Neal & Harwell, Nashville, TN, for Plaintiff.

Brian Casper, Douglas Edward Jones, Barbara Jones Perutelli, Gary Steven Rubenstein, Schulman, LeRoy & Bennett, Nashville, TN, Marshall T. Cook, Bone, McAllester & Norton, PLLC, Hendersonville, TN, Anne C. Martin, Erica Stiff-Coopwood, Stephen J. Zralek, Bone, McAllester & Norton, PLLC, Nashville, TN, for Defendants.

## MEMORANDUM

ALETA A. TRAUGER, District Judge.

Pending before the court is the plaintiff Cardinal Health 414, Inc.'s ("Cardinal's") Motion for Partial Summary Judgment (Docket No. 42), the defendant Daniel Adams' Motion For Summary Judgment (Docket No. 86), and the defendants Allen B. Townsend and Mid–South/Music City Nuclear Pharmacy's (collectively "Townsend/Music City's") Motion for Summary Judgment (Docket No. 95). For the reasons discussed herein, all these motions will be granted in part and denied in part. Also pending is Cardinal's Motion to Strike the Affirmative Defenses of Illegality and Laches or in the Alternative for Summary Judgment on These Defenses. (Docket No. 92.) This motion will be granted as a motion for summary judgment. Finally, Townsend/Music City's Motion For Attorney's Fees (Docket No. 103) will be denied.

## FACTUAL BACKGROUND

This case concerns e-mail snooping in Nashville's nuclear pharmacy industry.[1] A

---

1. Unless otherwise noted, the facts are drawn from the parties' summary judgment briefs

nuclear pharmacy compounds and dispenses radioactive materials for use in nuclear medicine procedures, and, therefore, a nuclear pharmacy only serves a select group of customers, *i.e.*, hospitals and clinics with nuclear medicine departments. In the entire mid-South area covering Middle Tennessee, Southern Kentucky, Bowling Green, Memphis, Knoxville, and Huntsville, Alabama, there are only about fifty potential customers for a nuclear pharmacy serving the mid-South.

Cardinal is a company that provides nuclear pharmacy services in this mid-South area. More than twenty-five years ago, defendant Townsend began working in Nashville's nuclear pharmacy industry for Cardinal's nuclear pharmacy predecessor company, Syncor, and remained with Cardinal's nuclear pharmacy division until the end of 2004. With that experience, Townsend gained an understanding of the customers in the mid-South nuclear pharmacy market and the prices they paid for nuclear pharmacy products. Defendant Adams is a licensed nuclear pharmacist who worked in the Nashville Syncor/Cardinal lab from 1997 until his resignation from Cardinal in February 2005. Like Townsend, Adams, through his years at Cardinal, gained an understanding of who the customers were in the mid-South's nuclear pharmacy market, the prices they paid, and what their needs were.

In the spring of 2003, Adams, while not losing his job at Cardinal, was replaced in the position of pharmacy manager by Robert "Greg" Young. To assist in the transition of pharmacy manager responsibilities, Young and Adams exchanged the username and password information that they each used to log onto the Cardinal web server to access e-mail and other work-related materials stored on-line.

In late 2004, Townsend decided to leave Cardinal to start his own nuclear pharmacy that would provide direct competition to Cardinal for the mid-South customer base. At this time, there was no competing nuclear pharmacy in the Nashville area. Townsend resigned from Cardinal in December 2004 on generally good terms with the people at Cardinal, and started Music City Nuclear Pharmacy ("Music City") in February 2005. Independently, Adams, who was friendly with Townsend, also decided to leave Cardinal in February 2005. Adams took a job at PETNET, which is located at Vanderbilt University in Nashville. PETNET provides a nuclear pharmacy service different from the service Adams provided at Cardinal, and PETNET does not engage in direct competition with Cardinal for Cardinal's nuclear pharmacy business to anywhere near the extent that Townsend/Music City now competes with Cardinal. Adams had a tense and "unpleasant" departure from Cardinal and did not have a final meeting with Young, who was out of the country at the time Adams left. In addition to taking the job at PETNET, Adams started a side business providing "health physics services" to nuclear pharmacy customers, and, for about a dozen hours over 2005 and 2006, Adams worked as a relief pharmacist at Music City.

Despite leaving Cardinal, Adams continued to log on to the Cardinal employee e-mail system. While Adams' access to his own Cardinal e-mail account had been ter-

(Docket Nos. 44, 59, 61, 74, 82, 88, 97, 113, and 129) and related affidavits and exhibits, as well as from the parties' large number of statements of material facts, (Docket Nos. 45, 62, 65, 70, 79, 80,87,96,104, 109, 114, 116, 117, 123, 130, and 134). Although facts are drawn from submissions made by both par-

ties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir.2000).

minated as of the day of his departure, Adams continued to log on to the system using Young's username and password, reading and reviewing the messages that Young received in his e-mail account. Adams also used the username and password of Marni Gardner, another Cardinal employee, whose log-on information Adams had obtained while at Cardinal. In his deposition, Adams testified that he accessed Cardinal e-mails from the time he left Cardinal until August 2006, when Cardinal changed Young's username and password information. It is not disputed that Cardinal's log-on page explicitly told visitors that the content therein was for Cardinal employees only.

Sometime in the late spring or early summer of 2005, Adams had a telephone conversation with Townsend, in which he told Townsend of his continued ability to log on to the Cardinal web server and to read the e-mails of Robert Young. Adams proposed the idea of sending some of these e-mails to Townsend. Adams and Townsend testified in their depositions that Adams thought Townsend might "enjoy" the e-mails because they concerned Cardinal employees that Adams and Townsend both knew. Townsend testified that, when Adams told him he wanted to give him these e-mails, Townsend said "okay."

There is no question that Adams and Townsend had a continuing relationship over the course of the next year, in which Adams sent Townsend certain e-mails that he pulled from Young's account. There is also no question that Townsend reviewed certain e-mails Adams sent, and there is also no question that Townsend discussed the content of certain e-mails with the people at Music City. There remains ample dispute, however, as to the frequency of these practices, as to the number of e-mails involved, and as to the content of the e-mails. Early in discovery in this matter, Cardinal submitted the affidavit of nuclear

pharmacy technician Tim Kirkland, who had left Cardinal in December 2004 to work with Townsend at Music City. Kirkland left Music City in July 2006, and, in conjunction with seeking another job with Cardinal, Kirkland told Robert Young about the e-mail snooping. In his sworn affidavit, Kirkland stated that, on a weekly basis from "early 2005" to November 2005, he picked up a "stack" of Cardinal e-mails from Adams at PETNET and delivered them to Townsend at Music City. According to Kirkland, after November 2005, Adams still prepared the weekly delivery for Townsend, but Adams provided Kirkland with the documents in a sealed envelope, so Kirkland was no longer privy to the content of the deliveries. Kirkland also stated that, on a weekly basis from early 2005 to July 2006, Adams faxed Cardinal materials to Townsend's fax machine at Music City. Kirkland stated that he observed Cardinal's profit and loss statements, customer pricing information, and other private and confidential information of a sensitive nature passing from Adams to Townsend over this year-and-one-half period.

The defendants vigorously challenge the details of Kirkland's account. They point out that Kirkland offered deposition testimony somewhat inconsistent with his affidavit. At one point in his deposition, Kirkland agreed with the proposition that he saw only "ten to twenty" illicitly obtained e-mails in total. Kirkland also testified that his motivation behind tipping off Young was to "get [Townsend]" because Townsend "pissed me off" about how raises were dispensed at Music City. While Kirkland was hazier in his deposition about the nature and volume of the deliveries and the content of the e-mails, he also explained that his declaration testimony was provided when the information was "fresh" in his mind. Overall, a full review of the substance and implications of the

Kirkland deposition testimony that the court was provided indicates that a substantial amount of Cardinal-related e-mails were passed from Adams to Townsend, with the common understanding that the information exchanged was important.

Adams and Townsend paint a very different picture of the scope and severity of the e-mail snooping. Adams claims that, after he left Cardinal, he went on the Cardinal e-mail system from "time to time," but not on a regular basis such that he would have a "stack" of e-mails ready for Townsend or Kirkland each week. Adams claims he engaged in the e-mail snooping out of a sense of "personal curiosity," and, while he knew Cardinal would not want him to do what he was doing, he did not feel that what he was doing was wrong or illegal. In addition to accessing and reading the e-mails from "time to time," Adams admits that he eventually told Townsend what he was doing and that he "occasionally" passed on material to Townsend. Adams softens this by claiming that the information he reviewed and passed on was not "confidential or proprietary in nature" but was rather pure "gossip." Adams claims that, in total, over the year and one-half that this conduct went on, he passed on as few as five illicitly obtained e-mails and no more than twenty.

For his part, Townsend admits receiving and reviewing a "few" Cardinal emails from Adams. Townsend claims that he did not solicit the e-mails, and he was rather an "unwitting recipient" who never encouraged what Adams was doing or benefitted from it. At his deposition, Townsend testified that he received "three to five" e-mails from Adams via e-mail, "five to six" via fax, and a "few hard copies." Townsend testified that, in total, he received "ten or so" e-mails from Adams, but it is clear that he and Adams had additional conversations regarding Cardinal on the phone. Townsend confirmed that Kirkland, on occasion, delivered Cardinal e-mails to him from Adams, but Townsend testified that "[t]here weren't a great deal .... probably three to five times in total, in a couple of years." Townsend also testified that he discussed the ramifications of e-mail snooping with an IT professional in November 2005, and, concerned by that conversation, Townsend told Adams to stop sending him Cardinal materials via e-mail. Townsend testified that, in June 2006, he told Adams to stop sending him Cardinal materials altogether. Townsend admitted that he read the e-mails Adams sent him, that he knew where the e-mails were coming from, and that he shared the correspondence with others at Music City.

It is undisputed that, during this period from spring 2005 to summer 2006, Cardinal lost business to Music City, and, during this same period, Cardinal had to make price concessions to some of its nuclear pharmacy customers due to competitive pressure from Music City. Cardinal estimates that it suffered about $1.5 million in losses from these defections and concessions. Robert Cody Scott, a salesperson for Cardinal, testified that during the time period of the e-mail snooping, "on two or three occasions customers would say, yes, [Music City] just left, or they were just in here yesterday ... [Young] and I ... we had said it's weird, it's like [Townsend's] got a bug in the office, that he knows when we're going in there and what price we're going in there at." Scott went on to testify that, while Townsend might have known certain pricing information from his time at Cardinal, these interactions with clients reflected that Townsend apparently had inside information as to price changes that occurred after Townsend left Cardinal.

In conjunction with its argument that the e-mails Adams passed along to Townsend contained nothing more than "gossip," with no "confidential or propriety"

information, Townsend/Music City claims that the customers Cardinal lost or made concessions to were simply impressed by the lower pricing Music City was able to provide, and Townsend received no information from the e-mails that he would not have already known or been able to find out. Townsend argues that he knew the mid-South nuclear pharmacy business "extensively" and, therefore, Townsend understood how to competitively price products and when to approach potential customers based on when their contracts with another nuclear pharmacy would expire. Townsend/Music City further contends that it is only natural that some customers would move from Cardinal to Music City, because Music City introduced competition and competitive pricing into the nuclear pharmacy marketplace in the mid-South. They argue that Music City simply provided a better deal and that that explains Cardinal's losses, and that this lawsuit is actually an attempt by Cardinal to stem the tide in favor of Music City, by draining Music City's assets before it can become an even stronger force for competition in the nuclear pharmacy industry in the mid-South.

After Kirkland reported the e-mail snooping to Young, Cardinal set to inspecting the damage. Cardinal changed Mr. Young's log-in information and password, at a cost, it claims, of $225. Cardinal quickly gathered that it would be impossible to independently determine which e-mails in Young's inbox Adams actually read, let alone passed along to Townsend.

Ten months after Cardinal was first notified of the e-mail snooping, Cardinal filed this lawsuit, alleging that Adams and Town send/Music City had violated federal law and Tennessee statutory and common law by accessing, reading and disseminating Young's emails. (Docket No. 1.) In discovery, Cardinal attempted to recover the e-mails that Townsend and Adams still had,

along with the computers that had been used to read the e-mails. Virtually all evidence of the scheme, however, was gone. All hard copies of the e-mails were gone, and Adams no longer had the computer that he had used to read Young's e-mails. Adams claimed that the computer had not been working correctly, so he threw it out. As to the Music City computers, one of them had apparently been stolen, but Cardinal had all others examined by a computer forensics expert, who found an internal Cardinal document on the laptop computer that Mr. Townsend used in his office at Music City. The document was a spreadsheet, last revised at Cardinal on August 10, 2005, well after both Townsend and Adams left Cardinal. The spreadsheet listed all of Cardinal's nuclear pharmacy customers in the area, the date on which each customer's contract was to expire, and the date that the contract would automatically renew if Cardinal did not receive notice of termination. At his deposition, Townsend admitted that Adams had forwarded the spreadsheet to him, and Townsend admitted reviewing the spreadsheet. But Townsend testified that he already knew the information in the spreadsheet because he had learned it during his time at Cardinal or in his subsequent interactions with his customers and potential customers.

Also during the course of this litigation, Cardinal attempted to reconstruct the e-mail boxes of Young and Gardner from backup tapes. Cardinal claims this reconstruction showed that these e-mail boxes, particularly that of pharmacy manager Young, contained "numerous sensitive internal company communications . . . [including] emails regarding business strategy, pricing, contracts with customers, personnel matters, communications with lawyers, etc," all of which Adams would have been privy to. While Cardinal has produced sample e-mails generat-

ed by the reconstruction, it is not possible to determine whether or not Adams reviewed the particular sample and passed it along to Townsend. Cardinal does point out, however, that the undisputed facts show that the information Adams and Townsend reviewed cannot all be considered "gossip," as no fair definition of "gossip" would include a spreadsheet listing of every one of Cardinal's Nashville customers and the date that customer's contract expired or was set to be automatically renewed. Cardinal argues that this customer list, combined with the "weird" interactions Scott and Young had with clients, permit a strong inference that a lot more than "gossip" was being regularly shared between Adams and Townsend. Cardinal argues that it is entirely plausible that, armed with the information about when a contract would expire or be automatically renewed, Townsend could approach a Cardinal customer at an opportune time and sweep that customer away from Cardinal. Again, the defendants respond that Townsend already knew all this customer information, and that Townsend wrested customers from Cardinal with lower pricing and better incentives.

In November 2007, Adams moved for partial summary judgment, arguing that the plaintiff's state law claims were preempted by federal law. (Docket No. 24.) This court denied that motion for summary judgment on February 6, 2008. (Docket No. 35.) On March 25, 2008, Cardinal moved for partial summary judgment, arguing that it was entitled to judgment as a matter of law on its claims under the Federal Stored Communications Act, the Federal Wiretap Act, the Tennessee Wiretap Act, and on its common law claim of civil conspiracy. The defendants argued that the plaintiff was not so entitled and cross-moved for summary judgment on all of the plaintiff's claims, which were, in addition to the four claims listed above, the plaintiff's claims for violation of the Tennessee Uniform Trade Secrets Act (TUTSA) and the Tennessee Personal and Commercial Computer Act. The parties filed numerous affidavits and voluminous materials in support of, and in response to, these motions. Additionally, May 12, 2008, Townsend/Music City moved to amend its answer to include the defenses of illegality and laches, a motion this court granted without objection. (Docket No. 73.) The plaintiff has moved to strike those defenses or, alternatively, has moved for summary judgment on the invalidity of those affirmative defenses as to this action. (Docket No. 92.) Finally, Townsend/Music City, claiming that the TUTSA claim was brought in bad faith, has moved for attorney's fees as provided for in TUTSA when an attorney brings a TUTSA claim in bad faith. (Docket No. 103.)

### ANALYSIS

The plaintiff claims the defendants violated the Federal Stored Communications Act ("SCA"), 18 U.S.C. § 2701 *et seq.*, the Federal Wiretap Act ("FWA"), 18 U.S.C. § 2510 *et seq.*, the Tennessee Wiretap Act ("TWA"), T.C.A. § 39–13–601 *et seq.*, the Tennessee Personal and Commercial Computer Act ("TPCCA"), T.C.A. § 39–14–601 *et seq.*, and the Tennessee Uniform Trade Secrets Act ("TUTSA"), § 47–25–1701 *et seq.* The plaintiff also alleges that the defendants engaged in a civil conspiracy, in addition to committing the underlying offenses addressed above. The plaintiff has moved for summary judgment on the SCA, FWA, TWA, and civil conspiracy claims, while the defendants have moved for summary judgment on all the plaintiff's claims. Additionally, the plaintiff has filed a motion to strike, or, in the alternative, for summary judgment on two of Townsend/Music City's affirmative defenses, and Townsend/Music City has moved for attorney's fees on the plaintiff's TUTSA

claim. The court will consider the claim-based summary judgment motions first, and then briefly address the latter two motions.

## I. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir.2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir.2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir.2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

If the non-moving party fails to make a sufficient showing on an essential element of the case with respect to which she has the burden, however, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537–38 (6th Cir.1999). To preclude summary judgment, the non-moving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir.2002). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir.2003) (quoting *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505). If the evidence offered by the non-moving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the non-moving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249–52, 106 S.Ct. 2505. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 431 (6th Cir.1999) (citing *Anderson*, 477 U.S. at 247–49, 106 S.Ct. 2505).

## A. Federal Stored Communications Act (SCA)

The relevant section of the SCA (also known as Title II of the Electronic Privacy Communications Act (EPCA)) provides that whoever "intentionally accesses without authorization a facility through which an electronic communication service is provided; or intentionally exceeds an authorization to access that facility; and thereby obtains . . . access to a wire or electronic communication while it is in electronic storage in such system shall be punished . . ." 18 U.S.C. § 2701(a). Section 2707 of the SCA provides that any person aggrieved by an SCA violation may sue the violator, provided that he or she can show that the act was violated with a "knowing or intentional state of mind." 18 U.S.C. § 2707(a). If the plaintiff can make that

showing, the plaintiff is entitled to actual damages, but the plaintiff is statutorily entitled to no less than $1,000, whether or not the plaintiff can prove actual damages. 18 U.S.C. § 2707(c); *Cedar Hill Associates v. Paget*, No. 04–557, 2005 WL 3430562, *3 (N.D.Ill. Dec. 9, 2005). Additionally, the plaintiff is eligible to recover for attorney's fees, costs, and, for willful or intentional violations of the SCA, punitive damages. *Id.*

█ Courts have settled that determining whether there was unauthorized access under the SCA is akin to determining whether there was trespass to property. *See Theofel v. Farey–Jones*, 359 F.3d 1066, 1072–73 (9th Cir.2004). A big distinction between committing the tort of common law trespass and violating the SCA, of course, is that intentional conduct is required to violate the SCA, *i.e.*, a highly culpable state of mind is required. "The term 'intentional' in this context is narrower than the dictionary definition of 'intentional.' 'Intentional' means more than that one voluntarily engaged in conduct or caused a result. Such conduct or the causing of the result must have been the person's conscious objective." *Butera & Andrews v. IBM Corp.*, 456 F.Supp.2d 104, 109 (D.D.C.2006) (internal citation omitted). That said, where the facts indisputably present a case of an individual logging onto another's e-mail account without permission and reviewing the material therein, a summary judgment finding of an SCA violation is appropriate. *See Wyatt Tech. Corp. v. Smithson*, No. 05–1309, 2006 WL 5668246, **9–10 (C.D.Cal.2006).[2]

█ While SCA punishes the act of accessing a "facility through which an electronic communication service is provided" in an unauthorized manner, the SCA does not punish disclosing and using the information obtained therefrom. *Sherman & Co. v. Salton Maxim Housewares, Inc.*, 94 F.Supp.2d 817, 820 (E.D.Mich.2000). As the *Sherman* court clearly stated, "section 2701(a) of the EPCA does not prohibit the disclosure or use of information gained without authorization.... Rather, section 2701(a) prohibits the intentional unauthorized access of an electronic communication service ...". *Id.* Other courts are in accord on the limited impact of the statute. *In re Am. Airlines, Inc., Privacy Litig.*, 370 F.Supp.2d 552, 558–59 (N.D.Tex.2005) (collecting cases and stating "the purpose of section 2701 is to prevent unauthorized access to a facility through which an electronic communication service is provided.... It appears evident that the sort of trespasses to which the [SCA] applies are those in which the trespasser gains access to information to which he is not entitled to see, not those in which the trespasser uses the information in an unauthorized way ....") (internal citation omitted).

With this overview of the statute and the supporting case law in mind, the court now

2. A single court, without citation, held that someone who, intentionally and without permission, read "opened" e-mails in another's e-mail inbox did not violate the SCA. *Bansal v. Russ*, 513 F.Supp.2d 264, 276 (E.D.Pa. 2007). Following a thorough examination of the statutory framework, the Ninth Circuit rejected this view a few years earlier, finding that, based on the statutory definition of "electronic storage," an e-mail is in "electronic storage" when it is waiting to be read and afterwards, and, therefore, intentionally reading an unauthorized e-mail, opened or not, is a violation of the act. *Theofel*, 359 F.3d at 1075. A sister district court, earlier this year, agreed with *Theofel*'s reasoning, holding that "the plain language of the statute seems to include emails received by the intended recipient where they remain stored by an electronic communication service." *Bailey v. Bailey*, No. 07–11672, 2008 WL 324156, *6 (E.D.Mich. Feb. 6, 2008). This court agrees with *Bailey* that the position articulated in *Theofel* is better reasoned and, therefore, it will not be necessary for purposes of this motion to consider whether or not Young's e-mails were already opened when Adams read them.

considers how the statute and supporting case law weigh on each party's motion for summary judgment as to this claim.

### 1. Daniel Adams

■ Daniel Adams plainly violated the SCA as a matter of law. Therefore, his motion for summary judgment on this claim will be denied, and Cardinal's motion for summary judgment on this claim will be granted as to Daniel Adams, entitling Cardinal to at least $1,000 from Adams as a matter of law.

Adams has readily admitted that, for well over a year after he left Cardinal, he repeatedly, intentionally, and knowingly logged onto the e-mail account of Robert Young, using Young's user name and password. (Docket No. 56 at 38–42.) Common sense should have been sufficient to indicate to Adams that this behavior was wrong, but, additionally, Cardinal's web server logon page had a banner ad that stated that the materials therein were for Cardinal employees only, and Adams certainly knew he was no longer a Cardinal employee. (Docket No. 44 at 6.)

In his defense, Adams argues that he was "authorized" to access Young's account because, in 2003, Young gave him his user name and password to aid in the transfer of job duties. (Docket No. 61 at 12.) Adams argues that, because Cardinal never changed Young's password, it accepted the fact that Adams might continue to access the account, even after Adams left Cardinal. (*Id.*) Adams likens this circumstance to that in the *Sherman* case. In *Sherman,* a former employee was accused of violating the SCA, because, after he left employment, he continued to use his personal access code to log on to the same business account (which was hosted by a third party) that he had used while at work. 94 F.Supp.2d at 821. The court found no SCA violation because, as to the former employee, there was never a "clear[ ] and [ ] explicit restriction on access." 94 F.Supp.2d at 821.

The distinctions between this case and *Sherman* are obvious. In *Sherman* the former employee was using his own access code to continue to log on to a third-party computer network. *Id.* Here, Adams used the log-in information for *another person,* a former co-worker, to spy on the activities of his former company. On these facts, to argue that continued access was "authorized" is absurd. If the SCA is designed to punish anything, it is designed to punish conduct such as Adams engaged in here. Drawing the analogy to trespassing, it is as if, two years earlier, Young asked Adams to water the plants in his office while he was on vacation and, for this purpose only, Young gave Adams an extra key to his office. Then, two years later, after Adams left the company, Adams used the key to come back in the office, snoop around, and take some of Young's work-related materials. Such conduct would clearly be trespassing. In short, Adams violated the SCA as a matter of law.

### 2. Townsend/Music City

■ As discussed above, the SCA punishes "access," but it does not punish disclosure and use of the information accessed. The allegations against Townsend/Music City are that Townsend disclosed and used the information he received from Adams, but there is no allegation that Townsend actually acquired the information directly from Young's e-mail account. Relying on this point, Townsend/Music City convincingly argues that it cannot be liable under the SCA and is entitled to a judgment as a matter of law on the plaintiff's SCA claim. (Docket No. 97 at 12.)

Recognizing that the SCA only punishes access [3], Cardinal argues that "access"

---

**3.** "Access" is not a defined term in the SCA.

should be considered to include, as it is in some state computer privacy statutes, conduct that "makes use of" computer resources, and, therefore, receiving material from a computer network, even indirectly from a third person, could be considered "accessing" the computer network, so long as "makes use of computer resources" is given the exceedingly broad definition that Cardinal advocates. (Docket No. 113 at 12.) Cardinal points out that, "while there is no proof that Defendant Townsend sat at the computer himself," the facts show that Townsend knew where the information was coming from and still happily accepted the information from Cardinal's e-mail server. (Docket No. 44 at 6.) Therefore, Cardinal argues, Townsend, in an unauthorized manner, intentionally made use of a computer, and he and Music City should be held liable for the unauthorized "access."

The court will not apply such a strained reading of the term "access." Conduct such as receiving unauthorized materials and discussing those materials implicates "disclosure" and "use" of those materials, and it is settled that the SCA does not punish "disclosing" and "using" the unauthorized materials. With all due respect to Cardinal, the court's reading of the term "access" is not "unreasonably narrow," but is the logical interpretation of a large body of case law that all points in the same direction.

■ Apparently recognizing an uphill battle to show that Townsend/Music City "accessed" the materials, Cardinal offers the notion that Adams was Townsend/Music City's agent, and, therefore, Townsend is liable for Adams' clear violations of the SCA. Whether an agency relationship exists, *i.e.*, whether an individual is representing or acting for someone else, is a question of fact to be determined based on the individual circumstances of the case. *White v. Revco Discount Drug Ctrs. Inc.,*

33 S.W.3d 713, 723 (Tenn.2000). If an agency relationship exists, the principal is bound by, and responsible for, the acts of the agent that occur within the scope of the agency, or those acts outside of the scope of the agency that the principal either directs or ratifies. *Webber v. State Farm Mut. Auto. Ins. Co.,* 49 S.W.3d 265, 269–70 (Tenn.2001).

■ Here, Cardinal's agency argument hinges on the fact that, for 10–15 hours over two years, Music City paid Adams to sub in as a relief pharmacist. (Docket No. 55 at 63–66.) While Cardinal makes much of the fact that Adams received a Music City W–2 for 2005 and 2006, and that Adams was listed as a relief pharmacist on a Music City mailing, Cardinal makes a "mountain out of a molehill" with its agency argument. (Docket No. 113 at 14.) While Cardinal is correct that Townsend/Music City could be liable for the SCA violations of his agents if Townsend directed or ratified the conduct, the facts simply do not support an agency relationship between Adams and Townsend/Music City. Adams worked at Music City two or three times a year for a few hours at a time as a relief pharmacist; the other approximately 8752 hours of the year (including the time when Adams was snooping), Adams was a PETNET employee or an independent pharmacist. Adams' connection with Music City is simply too tenuous to consider the relationship between Townsend/Music City and Adams to be one of principal and agent. *See ACT Inc. v. Sylvan Learning Sys., Inc.,* 296 F.3d 657, 667 (8th Cir.2002) (refusing to credit the statement of a summer intern uninvolved in the day-to-day affairs of the defendant company as a statement of an agent on behalf of the company). Therefore, as a matter of law, there is no agency relationship here. Because neither Townsend/Music City nor his agents accessed the e-mail accounts at

issue, Townsend/Music City is entitled to summary judgment on Cardinal's SCA claim.

## B. The Wire Tap Acts

■ Cardinal alleges that Adams and Townsend/Music City violated the Federal Wiretap Act (FWA) and the Tennessee Wiretap Act (TWA). As a preliminary matter, the parties agree that, at least as to this cause of action, the analysis of the state and federal statutes should be the same, and that the analysis should be based on how federal courts have analyzed the relevant issues under the FWA, because there is very limited TWA case law and the relevant TWA and FWA provisions employ identical language. (Docket No. 44 11–12; Docket No. 61 at 11; Docket No. 113 at 15.) This court agrees that whether both the TWA and the FWA have been violated here can be determined based on the FWA and its case law.

Under the FWA and the TWA, anyone who, without authorization, "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication" violates the acts. 18 U.S.C. § 2511; T.C.A. § 39–13–601. In addition to criminal sanction, one who violates the FWA and TWA is subject to a variety of civil penalties, including statutory damages, actual damages, attorney's fees, and costs. 18 U.S.C. § 2520; T.C.A. § 39–13–603(a). Both the FWA and the TWA define "intercept" as the "aural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device." 18 U.S.C. § 2510; T.C.A. § 40–6–303(11).

The core dispute between Cardinal and the defendants is whether the e-mails at issue were "intercepted." (Docket No. 44 11–12; Docket No. 61 at 11; Docket No. 113 at 15.) If Adams going on the Cardinal e-mail system and reading the e-mails at issue counts as interception, then there could be little question Adams violated the FWA and TWA. Additionally, because both the FWA and TWA punish disclosure and use of intercepted information, there would also be little question that Townsend/Music City would have also violated the FWA and TWA by disclosing and using the information that Adams had "intercepted." 18 U.S.C. § 2511(c)-(d); T.C.A. § 39–13–601(C)–(D). Whether an e-mail inappropriately reviewed in an e-mail inbox is "intercepted," as that term is defined in the FWA, has been the subject of substantial discussion in the federal system, including in two district courts in this circuit. The overwhelming body of case law, including from one district court in this circuit earlier this year, finds that, unless an e-mail is actually acquired in its split second transmission over a computer network, it cannot be "intercepted" as that term is reasonably understood. As discussed below, this court finds this interpretation persuasive, and, therefore, the defendants should prevail as a matter of law on Cardinal's wiretap act claims.

The Third, Fifth, Ninth, and Eleventh Circuits all agree that, for a communication to be "intercepted" under the FWA, that communication must be acquired during the "flight" of the communication. *Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 113 (3rd Cir.2003); *U.S. v. Steiger*, 318 F.3d 1039, 1047 (11th Cir.2003); *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 878 (9th Cir.2002); *Steve Jackson Games, Inc. v. U.S. Secret Serv.*, 36 F.3d 457, 463 (5th Cir.1994). In support of this view, there is, of course, the ordinary dictionary definition of "intercept," which is "to stop, seize, or interrupt in progress or course before arrival." *Konop*, 302 F.3d at 878 (citing *Webster's Ninth New Collegiate Dictionary* 630 (1985)). Also, there is the statutory history, which shows

that Congress created the SCA for the express purpose of addressing "access to *stored* . . . electronic communications and transactional records." *Id.* at 879 (citing S. Rep. 99–541 at 3) (emphasis added). Also, until October 2001, the definition of "wire communication" in the FWA included information in electronic storage, such as a voicemail, but the definition of "electronic communication" in the FWA did not include information in electronic storage, indicating that something like an e-mail would not be covered by the FWA. *Id.; Fraser,* 352 F.3d at 114. Further, after 9/11, Congress amended the FWA to eliminate communications in electronic storage from the definition of "wire communication," further indicating a congressional intent that the FWA should be primarily concerned with information in active transport, not stored information. *Id.*

Earlier this year, the Eastern District of Michigan considered this same issue in an FWA case in which a husband obtained his wife's e-mail password using key logging software, and then the husband used the ill-gotten password to read the wife's e-mail messages. *Bailey v. Bailey,* No. 07–11672, 2008 WL 324156, *1 (E.D.Mich. Feb. 6, 2008). The wife (now divorced) sued her ex-husband for violating the FWA. *Id.* Just as here, the parties disputed whether "interception" under the FWA "requires that the electronic communication be intercepted contemporaneously with its transmission." *Id.* at *4. Relying on the case law discussed above, the *Bailey* court determined that "the general reasoning . . . that based on the statutory definition and distinction between 'wire communication' and 'electronic communication,' the latter of which conspicuously does not include electronic storage, Congress intended for electronic communication in storage to be handled solely by the Stored Communication Act" was sound. *Id.* Because the e-mails at issue were not obtained contemporaneously with trans-

mission, the ex-wife's FWA claim failed as a matter of law. *Id.* at 5.

In response, Cardinal focuses the court's attention on the one case that came out differently. In *Potter v. Havlicek,* the Western District of Ohio called the prevailing view on whether e-mails could be "intercepted" under the FWA "hyper-technical" and ruled that abandoning the distinction between "in transit" and "in storage" was a "better reasoned position" than the consensus view. No. 06–211, 2007 WL 539534, *7 (S.D.Ohio February 14, 2007). The *Potter* court primarily relied on the lack of explicit direction on this issue from the Sixth Circuit, and a dissenting opinion in *Konop. Id.* Arguing *Potter* adopts the more pragmatic approach, Cardinal states that it would be "nearly impossible" to intercept an e-mail in flight, because an e-mail is being transmitted for only a split second and in separate data packets that are not reassembled until their arrival at the inbox of the intended recipient. (Docket No. 113 at 16.) Cardinal goes on to argue that "in a real world sense" Adams may have "intercepted" Young's e-mails by logging on to Young's account, reading unread e-mails, and then marking those e-mails "unread" before signing out. (*Id.*) Such possibility, Cardinal argues, encourages a more "pragmatic" approach, supposedly typified by the *Potter* decision. (*Id.*)

The court respectfully disagrees with Cardinal's position. The reasoning from the multiple circuit courts discussed above is sound and does not apply a "cramped" or non-sensible approach, as Cardinal argues. (*Id.*) Rather, these courts are applying the plain meaning of the verb "to intercept" and making the appropriate conclusions from the legislative history. Simply because e-mail is not readily susceptible to "interception" does not mean that the courts should bend the language

of the statute so it provides an additional avenue of relief to a supposedly aggrieved party. Congress has provided a remedy for the individual whose e-mails are accessed in an unauthorized way—the SCA.

Because the plaintiff has made no showing that the e-mails at issue were "intercepted," the defendants are entitled to summary judgment on the plaintiff's claims under the Federal and Tennessee Wiretap Acts.

## C. Tennessee Personal and Commercial Computer Act (TPCCA)

As to this claim, only the defendants have moved for summary judgment. As discussed below, because the record before the court plainly raises at least a genuine issue of material fact as to whether the defendants have violated this statute, summary judgment in the defendants' favor would be inappropriate.

■ The TPCCA is codified at T.C.A. § 39–14–601 through 606. In its complaint, Cardinal alleges that the defendants violated section 602 of the TPCCA, and that Cardinal is entitled to damages under section 604. (Docket No. 1 at 5.) Under section 602 and the facts presented, various potential avenues exist by which Cardinal could convince a reasonable jury of its claim for relief under the TPCCA against one or all of the defendants. For example, under section 602(b), "whoever intentionally and without authorization, directly or indirectly accesses any computer, computer system, or computer network" is in violation of the TPCCA and subject to civil damages under section 604. T.C.A.

§ 39–14–602(b)(1). Also, anyone who "makes or causes to be made" unauthorized copies "in any form" of computer data produced by a computer network is also in violation of the TPCCA and subject to civil damages under section 604. T.C.A. § 39–14–602(b)(5). Also, section 602(a) provides: "whoever knowingly, directly or indirectly, accesses, causes to be accessed, or attempts to access any telephone system, telecommunications facility, computer software, computer program, data, computer, computer system, computer network, or any part thereof, for the purpose of obtaining money, property, or services for oneself or another by means of false or fraudulent pretenses, representations or promises" is in violation of the TPCCA and subject to civil damages under section 604. T.C.A. § 39–14–602(a)(1). Further, section 602(c) provides that "whoever receives, conceals, uses, or aids another in receiving, concealing, or using any proceeds resulting from a violation ... of subsection (a) ... knowing the proceeds to be the result of such violation, or whoever receives, conceals, uses, or aids another in receiving, concealing, or using any books, records, documents, property, financial instrument, computer software, program, or other material, property, or objects, knowing that item has been used in violating ... subsection (a)" is in violation of the TPCCA and subject to civil damages under section 604 of the Act. T.C.A. § 39–14–602(c).[4]

While there is very little case law interpreting these provisions, the plain text of

---

4. Under the TPCCA, "access" means to "approach, instruct, communicate, or connect with, store data in, retrieve or intercept data from, or otherwise make use of any resources of a ... computer network, or information exchanged from any communication between computers or authorized computer users and electronic, electromagnetic, electrochemical, acoustic, mechanical, or other means." T.C.A. § 39–14–601(1). And "authorization" means "any and all forms of consent, including both implicit and explicit consent." T.C.A. § 39–14–601(2). One of the few courts to interpret these provisions implied that lack of authorization was consistent with lack of "permission." *Black & Decker v. Smith*, No. 07–1201, 2008 WL 2757081, *9 (W.D.Tenn. July 11, 2008).

the provisions themselves, combined with the facts of this case, raise at least a fact issue as to whether the defendants violated the TPCCA. For example, Adams appears to have violated section 602(b)(1), as he intentionally accessed a computer network without authorization. Also, a reasonable jury could find that Townsend/Music City violated section 602(b)(5) by causing to be made unauthorized copies of computer data from a computer network. It is not necessary to come to a precise conclusion as to each potential ground for relief Cardinal might have under section 602, as it is clear that the defendants are not entitled to summary judgment after considering only a couple of subsections.

The defendants' briefing in support of summary judgment on the plaintiff's TPCCA claim does not effectively address the challenges raised above. Townsend/Music City ignores section 604 and blindly asserts that the TPCCA only provides for criminal penalties, which is clearly wrong. (Docket No. 97 at 13–14.) Further, Townsend/Music City does not address Townsend's potential liability under Section 602(b)(5) for causing unauthorized copies of computer data from a computer network to be made. (*Id.*) For his part, Adams discusses the challenges Cardinal would face in proving certain violations of the TPCCA, but Adams can offer no reason to find in his favor as to section 602(b)(1), which punishes simple intentional, unauthorized access, other than to say

that Cardinal cannot prove "intent." (Docket No. 88 16–19.) Of course, proving the "intent" behind Adams' access is not Cardinal's burden; Cardinal's burden here is only to show that there is a genuine issue of material fact as to whether Adams intentionally accessed the computer network without authorization. That burden has been easily met.

Adams does correctly point out that to bring an action for a violation of the TPCCA, Cardinal would have to show injury. *Id.* at 18; T.C.A. § 39–14–604(a). But Cardinal has clearly raised a genuine issue of material fact as to whether it suffered actual damages by showing that it lost customers in the time period that the e-mail snooping was occurring, by pointing to the "weird" Cody Scott client meetings, and by showing that it sustained some minor damages in changing Young's e-mail password and in assessing the consequences of the snooping.[5] In short, based on the clear language of the Act, there is no question that there is at least a genuine issue of material fact as to whether the defendants violated the TPCCA.

### D. Tennessee Uniform Trade Secrets Act (TUTSA)

██ Only the defendants have moved for summary judgment on the plaintiff's TUTSA claim. The plaintiff claims that the defendants violated the TUTSA by accessing the trade secrets held in Young's email account and then by disclosing and

---

5. The defendants repeatedly claim that the plaintiff cannot show any actual damages in this case, and, therefore, all of the plaintiff's claims that require a showing of damages should be rejected at this stage. The defendants argue that the damages calculations of Cardinal's damages expert are based on the unfounded suspicion that, during the time period of the e-mail snooping, all Cardinal customers who were lost to Music City were lost due to the e-mail snooping, and all concessions Cardinal made during that time were made because of the e-mail snooping. (Docket No. 88 at 7–9, 18–19, 24; Docket No. 97 7–9.) While tying all of Cardinal's lost clients and concessions to the e-mail snooping does seem like a large leap in logic, the vast uncertainty as to what information Adams and Townsend obtained, combined with the "weird" client meetings reported by Cody Scott and the clear costs to guard against future snooping by Adams, indicates a genuine issue of material fact exists as to whether Cardinal has sustained actual damages.

discussing those trade secrets. (Docket No. 1 at 6–7.) As with the plaintiff's TPCCA claim, genuine issues of material fact preclude summary judgment for the defendants.

The definition of a trade secret under this statute is "information, without regard to form, including, but not limited to, technical, nontechnical or financial data, a formula, pattern, compilation, program, device, method, technique, process, or plan that (A) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and (B) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." T.C.A. § 47–25–1702(4). Under the TUTSA, a civil litigant is entitled to recover actual damages for misappropriation of a trade secret.[6] T.C.A. § 47–25–1704(a). The parties point the court to a six-factor test to determine whether information is a trade secret, which considers, for each alleged trade secret: (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and to its competitors; (5) the amount of money or effort expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. See *Wright Med. Tech., Inc. v. Grisoni,* 135 S.W.3d 561, 589 (Tenn.Ct. App.2001).

In their briefing, the defendants make unfounded arguments that purport to limit the universe of information that they could have reviewed and used, and then argue that, as a matter of law, information within that universe is not a trade secret. Adams claims that the "information purportedly at issue" is customer lists and pricing information, which is information that the defendants already knew, or was readily available. (Docket No. 88 at 20–21.) Adams also applies the six-factor test and determines customer information and pricing lists are not trade secrets. (*Id.* at 21–22.) Town send/Music City makes a similar argument, claiming that, because Townsend knew the nuclear pharmacy business so well, and because pricing and customer information were not secrets to those in the industry, Cardinal's TUTSA claim fails as a matter of law. (Docket No. 97 at 3–6.)

In response, Cardinal argues (1) that some courts in other jurisdictions have found that when information is acquired in a devious way it is more likely to be considered a trade secret; (2) that, based on the case law, the issue is not whether Adams and Townsend *could* have acquired the information by independent means but, rather, the issue is how the information was actually acquired that influences the determination of whether the information at issue is a trade secret; and (3) that information of the type believed to be in Young's e-mail box has been found to be entitled to trade secret protection by some courts in certain contexts. (Docket No. 113 23–25.)

The crucial point for the purposes of the defendants' summary judgment motions is,

**6.** Included in the definition of misappropriation is the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." T.C.A. § 47–25–1702(2). Clearly, just from this one example, if the

matter Adams found in Young's e-mail box and passed on to Townsend/Music City was determined to be a trade secret, a reasonable jury could find, as to all defendants, that the trade secret had been misappropriated.

however, that there are genuine issues of fact as to what information was in Young's e-mail box, and what of that information Adams reviewed and passed on. As Cardinal points out, while it is unclear what the defendants saw and discussed, it is reasonable to assume that they may have seen more than they now admit or remember seeing, and, it is also clear that, based on Cardinal's reconstruction of Young's inbox, a variety of sensitive and confidential internal documents were maintained therein. (*Id.* at 26.) Further, when the information was "fresh in his mind," Kirkland stated that he saw Cardinal communications of a "private and confidential" nature being passed from Adams to Townsend on a weekly basis. (*Id.*) While it may not be possible to know what exactly was in Young's e-mail box, it is clear that the defendants are not entitled to summary judgment on the argument that they only looked at pricing information, customer lists, and that sort of information. As genuinely disputed issues of material fact remain as to what precisely was in Young's e-mail box and what precisely the defendants disclosed and used, the court cannot determine as a matter of law whether trade secrets were misappropriated. Therefore, summary judgment for the defendants would be inappropriate.[7]

### E. Civil Conspiracy

The parties have also made cross-motions for summary judgment on the issue of whether a civil conspiracy existed between Townsend/Music City and Adams. Cardinal apparently only seeks a judgment as a matter of law that there was a civil conspiracy to violate the SCA, the FWA, and TWA, *i.e.*, reviewing Cardinal's briefing it does not appear Cardinal seeks summary judgment that a civil conspiracy ex-

isted to violate the TPCCA or the TUTSA. (Docket No. 44 at 15–16.) The defendants, on the other hand, seek a judgment as a matter of law that there was no civil conspiracy as to any of the claims the plaintiff asserts in this litigation. (Docket No. 88 at 23–24; Docket No. 97 at 9–12.)

▆▆▆ In their motions for summary judgment, the defendants convincingly argue that Cardinal's claim for civil conspiracy is preempted by the TUTSA. In addition to providing a statutory cause of action for the misappropriation of a trade secret, the TUTSA displaces "conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret." T.C.A. § 47–25–1708(a). The TUTSA does not affect civil remedies that "are not based upon misappropriation of a trade secret." T.C.A. § 47–25–1708(b). The defendants direct the court's attention to *Hauck Manufacturing Co. v. Astec Indus., Inc.,* in which the Eastern District of Tennessee thoroughly analyzed the diverse range of case law throughout the country interpreting this provision of the Uniform Trade Secrets Act, and concluded that, based on the facts of that case, the plaintiff's civil conspiracy claim was preempted, because it was "based on" trade secret misappropriation. 375 F.Supp.2d 649, 653–61 (E.D.Tenn.2004).

As *Hauck* recognized, the key challenge in analyzing the scope of UTSA preemption is determining what civil claims beyond, obviously, common law trade secret misappropriation are preempted. That is, at what point is a civil claim "not based upon" trade secret misappropriation and therefore not preempted. In *Hauck*, the defendant alleged that a civil conspiracy claim, along with a series of other tort

---

**7.** Based on this finding, it is clear that Cardinal did not bring the TUTSA claim in bad faith, and, therefore, Townsend/Music City's

motion for attorney's fees on that ground will be denied. (Docket No. 103.)

claims, was preempted because it was "based on alleged misappropriation of trade secrets." *Id.* at 653. The plaintiff argued that the tort claims were not preempted because the substance of the claims went beyond misappropriation. *Id.* The *Hauck* court considered the vast array of conflicting and often confused case law surrounding this UTSA provision before concluding that the best approach to UTSA preemption was to apply the "same proof" test, which says, "a claim will be preempted when it necessarily rises or falls based on whether the defendant is found to have misappropriated a trade secret .... if proof of a non-[T]UTSA claim would also simultaneously establish a claim for misappropriation of trade secrets, it is preempted...." *Id.* at 658.

Applying this standard, *Hauck* recognized that many civil claims that allege theft of secret information would be preempted, even if not all of the secret information was technically a trade secret. *Id.* "The UTSA explicitly exempts from preemption only those claims 'not based upon misappropriation of a trade secret,' implying that UTSA's preemptive force reaches more than just claims of or for misappropriation of a trade secret. Thus, plaintiff's non-UTSA claims against [the defendant] will be preempted if ... they would succeed or fail dependant on proof [the defendant] acquired, disclosed, or used plaintiff's trade secrets *or otherwise confidential information* ..." knowing that that information was acquired through improper means. *Id.* (emphasis added)

The court went on to rule that, among other things, the plaintiff's claim for civil conspiracy was preempted. *Id.* at 661. The court said, "although at least one of the alleged predicate torts might not itself be preempted by the [T]UTSA ... plaintiff's allegations clearly indicate the overriding object of the conspiracy was to disseminate plaintiff's confidential and proprietary information. As such, plaintiff effectively alleges [the defendants] conspired to acquire, disclose, or use plaintiff's confidential and propriety information by improper means." *Id.* at 660. The court acknowledged that the plaintiff claimed that some of the unlawful conduct involved "confidential and propriety information" other than trade secrets, but the court held that the UTSA preemption provision is designed to be broad and "clearly preempts all general tort claims for theft of secret information.... [P]laintiff's civil conspiracy claim is clearly *based upon* alleged misappropriation of trade secrets and is therefore preempted." *Id.* at 661. (emphasis added)

In response, Cardinal simply ignores *Hauck's* application of the "same proof" test to the civil conspiracy claim. (Docket No. 113 at 34–35.) That said, this court agrees with the well-reasoned and considered opinion of its sister district court. In the civil conspiracy context, it is clear that, in order for the preemption statute to have any force, the court must look at what the overarching substance of the plaintiff's allegation is. Where, as here, the overarching allegation is that the defendants conspired to steal confidential and propriety information, some or all of which may constitute a trade secret, the civil action for conspiracy is preempted by the TUTSA.

Because the plaintiff's civil conspiracy claim is preempted by the TUTSA, the defendants are entitled to judgment as a matter of law on that claim.

## II. Other Motions

As noted above, two other motions are pending before the court. One, Townsend/Music City's motion for attorney's fees will be denied for the reasons discussed in the TUTSA section above. Two, the plaintiff has moved to strike, or, in the

alternative, for summary judgment on the defendant Townsend/Music City's affirmative defenses of laches and illegality. (Docket No. 92.) In asserting "illegality" as an affirmative defense, Townsend/Music City appears to be arguing that Cardinal brought this action only to drive Townsend/Music City out of business and to re-assert a monopoly in the Nashville nuclear pharmacy industry. (Docket No. 108 at 1–4.) In its laches defense, Townsend/Music City is essentially making the same argument, claiming Cardinal was not planning to sue here until, ten months after Kirkland revealed the e-mail snooping to Young, Cardinal lost a big client to Townsend/Music City.

Because, as Townsend/Music City points out, striking an affirmative defense is generally disfavored, summary judgment is the better approach for resolving the validity of these affirmative defenses. (Docket No. 108 at 2.); *See FDIC v. Giammettei*, 34 F.3d 51, 54 (2nd Cir.1994) (holding a plaintiff is entitled to summary judgment on an affirmative defense by showing "an absence of evidence to support an essential element of the non-moving party's case.") (citations and internal quotations omitted)

■ First, as to Townsend/Music City's affirmative defense of laches, Cardinal is entitled to summary judgment. The affirmative defense of laches requires proof of an "inexcusably long delay in commencing the action which causes prejudice to the other party." *Patton v. Bearden*, 8 F.3d 343, 347 (6th Cir.1993). In support of summary judgment, Cardinal argues that waiting ten months, from the time Kirkland notified Young of the e-mail snooping, to file suit was not inexcusably long, and, further, Townsend/Music City can show no prejudice from any delay. (Docket No. 93 at 7–8.) In response, Townsend/Music City argues that Cardinal's loss of a key customer—the Heart Group—to Townsend/Music City resulted in Cardinal's "re-flexive" decision to bring this lawsuit. (Docket No. 108 at 5.) Townsend/Music City does not explain how the ten-month delay was "inexcusably long," and Townsend/Music City presents no evidence of prejudice. (*Id.*) Therefore, Townsend/Music City's affirmative defense of laches fails as a matter of law.

■ Second, through its "illegality" defense, the parties agree that Townsend/Music City is defending itself by arguing that Cardinal's lawsuit is an anti-competitive maneuver to reestablish its nuclear pharmacy monopoly in the mid-South. (Docket No. 93 at 5–6; Docket No. 108 at 3–4.) Therefore, "illegality," as used here, is being used differently from how the expression is typically used, *i.e.*, to describe a defense to enforcement of a contract. (Docket No. 93 at 3–4.) No matter the term used, Cardinal is correct that, based on the facts presented here, Townsend/Music City does not have an "illegality" defense as a matter of law.

■ Under the *Noerr–Pennington* doctrine, a business is immune from antitrust liability for actions taken in lobbying the government, including the courts, for redress of grievances, even if "the petitioning activity has the intent or effect of depriving another of property interests, except under very limited circumstances." *Knology v. Insight Communications Co.*, 393 F.3d 656, 658 (6th Cir.2004) (internal quotations omitted). In the court system, those limited circumstances arise when the petitioner brings a "sham lawsuit." *Id.* A "sham lawsuit" is "objectively baseless" and is solely an "anticompetitive weapon." *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus. Inc.*, 508 U.S. 49, 60–61, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993). Where the plaintiff has an objectively reasonable belief in the success of his lawsuit, the litigation is not a sham. *Id.* at 62, 113 S.Ct. 1920. Absent a show-

ing of "sham" litigation, the plaintiff is free to "petition the government for redress," even if the lawsuit results in damage to a competitor.[8] *Knology,* 393 F.3d at 658.

Here, based on the analysis of each of the claims in this lawsuit, this litigation is obviously not "objectively baseless" or a "sham." While Town send/Music City may be frustrated by the collateral impact of the litigation, its defense that Cardinal is illegally reasserting a monopoly in the mid-South nuclear pharmacy industry is not permissible as a matter of law.

## CONCLUSION

For the reasons discussed above, each of the plaintiff's and defendants' claim-based summary judgment motions will be granted in part and denied in part. The plaintiff is entitled to summary judgment on its claim that defendant Adams violated the SCA, and the plaintiff is therefore entitled to at least $1,000 in damages. Defendant Townsend/Music City is entitled to summary judgment on the plaintiff's SCA claim. All defendants are entitled to summary judgment on the plaintiff's FWA, TWA, and civil conspiracy claims. The defendants are not entitled to summary judgment on the plaintiff's TPCCA and TUTSA claims. Also, the damages the plaintiff suffered represent a clear issue of fact for the jury. Townsend/Music City's motion for attorney's fees will be denied, and the plaintiff's motion for summary judgment as to the affirmative defenses of laches and illegality will be granted. An appropriate order will enter.

## ORDER

For the reasons expressed in the accompanying Memorandum, the plaintiff's Motion for Partial Summary Judgment (Docket No. 42) is **GRANTED IN PART AND**

**DENIED IN PART**; the defendant Daniel Adams' Motion for Summary Judgment (Docket No. 86) is **GRANTED IN PART AND DENIED IN PART**; the defendants Allen B. Townsend and Mid-South/Music City Nuclear Pharmacy's (collectively "Townsend/Music City's") Motion for Summary Judgment (Docket No. 95) is **GRANTED IN PART AND DENIED IN PART**; the plaintiff's Motion to Strike The Affirmative Defenses of Illegality and Laches or in the Alternative for Summary Judgment on These Defenses (Docket No. 92) is **GRANTED** as a motion for summary judgment; and Townsend/Music City's Motion For Attorney's Fees (Docket No. 103) is **DENIED**.

It is so ordered.

---

**8.** The Supreme Court links *Noerr–Pennington* immunity to activities that "petition the government for redress" of grievances, which, the Supreme Court has held, includes filing a lawsuit. *Professional Real Estate Investors, Inc.,* 508 U.S. at 56–57, 113 S.Ct. 1920.