962 N.E.2d 29 (2011)
Diane BORCHERS, Plaintiff-Appellant,
v.
FRANCISCAN TERTIARY PROVINCE OF the SACRED HEART, INC., d/b/a Mayslake Village, Inc.; Michael A. Frigo; and Katherine Maxwell, Defendants-Appellees.
No. 2-10-1257.
Appellate Court of Illinois, Second District.
December 7, 2011.
As Modified upon denial of rehearing February 28, 2012.
*32 Rebecca E. Cahan, Annemarie E. Kill, Avery Camerlingo Kill, LLC, Chicago, for Diane Borchers.
Heather R. Watterson, Kopon Airdo, LLC, Chicago, for Franciscan Tertiary Province of the Sacred Heart, Inc.

OPINION
Justice SCHOSTOK delivered the judgment of the court, with opinion.
¶ 1 After the plaintiff, Diane Borchers, found out that her former employer, the defendant Franciscan Tertiary Province of the Sacred Heart, Inc., d/b/a Mayslake Village, Inc. (Mayslake), had accessed her personal e-mail account and printed out over 30 personal e-mails, she brought suit against Mayslake, alleging violations of title II of the federal Electronic Communications Privacy Act of 1986 (the Stored Communications Act) (18 U.S.C. § 2701 et seq. (2006)) and the tort of intrusion upon seclusion. Later she added as individual defendants two employees of Mayslake: her former boss, Michael Frigo, and his administrative assistant, Katherine Maxwell. Mayslake filed a motion for summary judgment and the trial court granted it, finding that the plaintiff had not produced sufficient evidence that the defendants acted intentionally. The trial court also granted the individual defendants' motion to dismiss the complaint as to them on the grounds that they were not named as defendants until after the statute of limitations had run, and the cause of action as to them did not "relate back" to the filing of the original complaint. The plaintiff appealed. We affirm in part and reverse in part, and remand for further proceedings.

¶ 2 BACKGROUND
¶ 3 The following facts are drawn from deposition testimony and other evidence the parties submitted in connection with Mayslake's motion for summary judgment. Mayslake is a not-for-profit corporation that operates Mayslake Village, a facility providing housing to low-and moderate-income senior citizens. The plaintiff began working for Mayslake about 1994, serving as the facility's food service director. In that capacity she planned menus, ordered food, took inventory, served, cleaned, hired and trained the food service staff, and supervised the dining room service and special events. Her office, which had a computer, was in a separate room in the kitchen area. As part of her job, she placed orders for food via the Internet, and occasionally responded to e-mails from vendors or other employees via e-mail. Mayslake issued the plaintiff a Compuserve e-mail account to use for work.
¶ 4 In 1999, Mayslake issued a written policy regarding the use of its computers. The policy repeatedly stated throughout that it applied to information that was "entered, created, received, stored or transmitted via MAYSLAKE technology resources." Nothing in the policy stated that it extended to any other information. Pertinent sections of the policy read as follows:

*33 "1. Other Than Occasional Personal Use, MAYSLAKE Technology Resources May Be Used Only For Legitimate, Business-Related Reasons
Other than occasional personal use, MAYSLAKE technology resources may be used only for legitimate business-related reasons. Occasional personal use means minimal and infrequent use that does not interfere with MAYSLAKE business or the availability of technology resources. All use of MAYSLAKE technology resources (including personal use) is subject to this Policy.
MAYSLAKE technology resources may not be used to conduct personal business of any kind. *** All information that is entered, created, received, stored or transmitted via MAYSLAKE technology resources, including all e-mail messages, are and will remain MAYSLAKE property. ***
2. No Expectation of Privacy
Users should have no expectation of privacy in connection with the entry, creation, transmission, receipt, or storage of information via MAYSLAKE technology resources. Users waive any right to privacy in information entered, created, received, stored or transmitted via MAYSLAKE technology resources, and consent to access and disclosure of such information by authorized MAYSLAKE personnel.
As with all other MAYSLAKE property, MAYSLAKE technology resources and all information entered, created, transmitted, received or stored via MAYSLAKE technology resources is subject to inspection, search and disclosure without advance notice by persons designated or acting at the direction of the Administrator, or as may be required by law or as necessary to ensure the efficient and proper administration and operation of MAYSLAKE's technology resources. For example, authorized persons may inspect, search and disclose such information to investigate theft, disclosure of confidential business or proprietary information, personal abuse of the system, or to monitor work flow or productivity. * * * Because MAYSLAKE is sensitive to employee concerns, it will make every effort to ensure that all such inspections are conducted professionally and ethically. Users, however, must recognize that authorized persons have the ability to track and monitor all information sent internally and externally to MAYSLAKE via technology resources." (Emphasis in original.)
¶ 5 In April 2004, Mayslake decided to switch from its dial-up Internet service with Compuserve to a high-speed service with Comcast. During the transition, the plaintiff downloaded AOL onto her work computer and used her personal AOL account to handle work-related e-mails. Prior to this, she had never accessed her personal AOL account from her work computer. Mayslake issued the plaintiff a Comcast e-mail address on May 19, 2004. Thereafter, she used only the Comcast account for work-related e-mails. Although an icon for AOL remained on her computer desktop screen, she testified that she did not access her personal AOL account while at work after that, except possibly for one occasion in January 2007.
¶ 6 The plaintiff's supervisor in 2007 was Michael Frigo, who was a vice president of Mayslake. Frigo reported to the board of directors. Father Larry Dreffein was the president of that board. Maxwell was Frigo's administrative assistant.
¶ 7 In January 2007, the plaintiff reported to Mayslake personnel that Frigo had engaged in sexual harassment. In February 2007, the plaintiff contacted the Equal Employment Opportunity Commission *34 about the sexual harassment and spoke with a lawyer. Mayslake conducted an internal investigation and told the plaintiff that it had concluded that there was no evidence of sexual harassment. The plaintiff testified that her working relationship with Frigo was good until she filed the sexual harassment claim, but it deteriorated after that.
¶ 8 Friday, March 16, 2007, was the last day that the plaintiff performed her regular duties for Mayslake. At the end of that day, she went home and did not return to her job thereafter. At various points in time, she advised Mayslake employees that she was taking sick leave due to mental health problems and she submitted doctor's notes. In April 2007, the plaintiff began receiving short-term disability, and in July 2007 she began receiving long-term disability. In June 2007 Mayslake hired someone else to fill the position of food service director. Also in June 2007, the plaintiff's charge of sexual harassment was officially filed.
¶ 9 At some point between April 11 and April 30, 2007,[1] Maxwell went to the computer located in the plaintiff's office, clicked on the AOL icon, and accessed the plaintiff's personal e-mail account. She read part or all of various e-mails that the plaintiff had sent to or received from friends, family members, and others since the plaintiff's last day of work, and printed out more than 30 of them. According to the deposition testimony of Frigo and Maxwell, this occurred in the following manner.
¶ 10 A few weeks after the plaintiff left work, Frigo received reports from the plaintiff's assistant in the kitchen, Brenda Gordon, who was running the food service in the plaintiff's absence, that she was overwhelmed. Gordon asked that someone check the plaintiff's voicemail and e-mail to make sure that orders and previously booked special events did not fall through the cracks. Frigo told Gordon that he would have someone take care of it. Frigo then asked Maxwell to go to the plaintiff's office and check her regular mail, her voicemail, and her e-mail. Frigo did not tell Maxwell that she should limit her search to work-related items, but he assumed that she would.
¶ 11 Maxwell went to the plaintiff's office. In checking the plaintiff's e-mail, she hit "start" on the computer, clicked on the Internet Explorer icon, and saw a screen that had an icon for AOL as well as one for Comcast. She testified that she clicked on the AOL icon, thinking that it was a work-related account (the evidence relating to this is explored further below). Clicking on the icon accessed the account without any preliminary login or password being required. Maxwell saw an in-box for the account: a screen that listed the e-mails that had been received and that showed, for each e-mail, the date the e-mail was received, the sender, and a subject line. The dates listed for the e-mails were after the plaintiff had left work. Many of the senders were unknown to Maxwell, but a few were other Mayslake employees.
¶ 12 Maxwell initially testified that, in the AOL account in-box, she opened and *35 read only those e-mails that she thought related to Mayslake's food service because they were from a food service employee or the subject line appeared to be related to food service. However, she later explained that she also read part or all of the e-mails that had no subject line, or that were to or from people she did not know, in case they related to a private party or catering. Including both the AOL and the Comcast accounts, she read part or all of about 80% of all the e-mails she saw, ignoring only those that clearly pertained to food industry events that were already past. There were no e-mails that she did not open because she could tell from the subject line that they were personal. Maxwell initially stated that if she determined that an e-mail was not related to food service, she deleted or closed it. If it was related to food service, she printed the e-mail and gave it to Frigo. Later, however, she testified that she printed the e-mails from the plaintiff's AOL account because "they were awful"they contained "awful language" or were "vile" and "not professional." Maxwell admitted that most of the e-mails she printed had been sent by the plaintiff to other people, and thus would not have been in the in-box of the plaintiff's AOL account. When asked if she looked at parts of the plaintiff's AOL account besides the in-box, she could not recall. She gave the printed e-mails to Frigo because "[h]e needed to see them." Maxwell agreed that the plaintiff had not authorized her to view the e-mails. She also agreed that the 36 e-mail printouts from the plaintiff's AOL account shown to her at her deposition were the e-mails she printed out. Although she also checked the plaintiff's Comcast account on the food service computer and saw "boatloads" of e-mails there, the 36 e-mails from the AOL account were the only e-mails that she printed out. In its answers to interrogatories, Mayslake confirmed that there were no printouts of any e-mails from the food service computer other than these 36.
¶ 13 Maxwell testified that, at the time she accessed the plaintiff's AOL account on the food service computer, she believed that some Mayslake employees, including those in food service, had work-related AOL accounts. She believed this because, sometime in the past, she had been told this by a Mayslake employee who worked in the development office. However, as of the date of her deposition, she had never used an AOL e-mail address to e-mail anyone at Mayslake regarding work. Also, when asked what e-mail account she was aware that the plaintiff was using for work-related purposes at that time, Maxwell replied, "Comcast." Frigo and Dreffein also testified that they believed that some Mayslake employees had AOL accounts. However, at her deposition, Maxwell reviewed e-mails that she had sent out in February 2007 to Mayslake employees and confirmed that all of the e-mail addresses were at Comcast, and none were at AOL. In discovery, Mayslake was unable to produce any documents showing that anyone at Mayslake other than a single employee in the development office ever had a work-related AOL account.
¶ 14 Frigo testified that, later on the same day that he asked Maxwell to check the plaintiff's e-mail and voicemail, Maxwell brought him printouts of e-mails from the plaintiff's AOL account. He looked at a few of them and realized that they were "very personal" and "had nothing to do with Mayslake business." He did not know how to handle the situation, so he called Mayslake's attorney, Ronald Lipinski of Seyfarth Shaw. He later gave the printouts to Dreffein. Dreffein testified that he put the printouts in an envelope without looking at them and carried them to Lipinski in Chicago. While Dreffein was at Seyfarth Shaw's offices, he met *36 with Lipinski and Joan Gale, the Seyfarth Shaw attorney who was representing Mayslake in connection with the plaintiff's sexual harassment claim.
¶ 15 On April 30, 2007, Lipinski sent a letter to the plaintiff's attorney. The letter stated that the enclosed printouts of e-mails, which included what appeared to be a communication between the plaintiff and her lawyer, had been obtained by "Mayslake personnel" who "accessed e-mails through the computer located in the kitchen office at Mayslake Village" pursuant to Mayslake's "computer usage policy." The letter stated that no copies of the e-mail to the plaintiff's lawyer had been retained. In addition, "other e-mails were copied by Mayslake personnel," and copies of those e-mails were also enclosed. Although a superficial reading of the letter might leave the reader with the impression that Mayslake and its lawyers had given all the copies of the e-mails to the plaintiff's attorney and had not retained any, a closer reading shows that Lipinski made that claim only with reference to the e-mail from the plaintiff to her attorney, and not about the remaining e-mails. Gale was copied on the letter.
¶ 16 Printouts of 36 e-mails were attached to Lipinski's April 30, 2007, letter to the plaintiff's attorney. Each appeared to be a printout of the e-mail itself, with a heading listing the sender(s), the recipient(s), the subject, and the date and time sent, followed by the body of the e-mail. The great majority of the e-mails were from the plaintiff to someone else; only three were e-mails sent to the plaintiff. The topic most frequently mentioned was the plaintiff's feelings of anxiety, stress, despair, betrayal, anger, and depression relating to the circumstances of her departure from Mayslake. The e-mails also focused on the plaintiff's health, including a sinus infection diagnosed on her last day at work and the physical effects of her anxiety and depression, and mentioned visits to her doctor and therapist. About 10 of the e-mails expressed spiteful feelings toward the defendants, particularly Frigo and Dreffein, with reference to their treatment of her and their difficulties staffing the dining room after the plaintiff left. One-quarter of the e-mails discussed the plaintiff's intention not to return to work and instead to take her sick leave and then seek disability benefits, so that she could maintain some income and insurance benefits as long as possible. The plaintiff justified this plan by saying that if she returned to work she could be fired at any time, that she did not feel she had any other options, and that this way she could "heal on my own time, but they pay for it." The plaintiff also discussed what happened at work that made her decide to leave, including the reaction to her sexual harassment claim and being forced to fire one of her workers, and her need to start a new life and some of the things she might do, including exercising, taking dance lessons, and painting her house. Three of the e-mails contained foul language relating to Frigo, Dreffein, and a private investigator the plaintiff believed had been photographing her one day. As noted, one of the e-mails was a communication from the plaintiff to her attorney.
¶ 17 Many of the e-mails also mentioned personal matters that were unconnected to Mayslake, such as family news and plans for getting together with friends. Five of the e-mails were wholly personal and did not relate in any way to Mayslake. The subject lines of the e-mails included: "hello," "Re: mom," "Fwd: FW: Fwd: Coffee and Sex," and "Fwd: David Copperfield] cooltry itart(UNBELIEVABLE)." None of the e-mails Maxwell printed out contained any communication that might be viewed as necessary to the operation of Mayslake's food service, such as food orders, *37 vendor accounts, or special event planning.
¶ 18 Of the e-mail printouts sent to the plaintiff's attorney, three had highlighting on them, and one had handwritten comments and underlining. Maxwell identified the handwriting as Frigo's.
¶ 19 The plaintiff testified that, although her attorney received copies of the e-mails in April 2007, she did not learn that her personal AOL account had been accessed until later. In August 2007, Mayslake's attorneys filed with the Department of Human Rights Mayslake's response to the plaintiff's sexual harassment claim. Copies of the printouts of the 36 e-mails were attached as exhibit D. The plaintiff learned in September 2007 that her e-mails had been accessed, printed, and shared. She withdrew her sexual harassment charge shortly thereafter.
¶ 20 On April 8, 2009, the plaintiff filed a verified five-count complaint against Mayslake and "unknown persons" in the circuit court of Du Page County. Mayslake was served in July 2009. On Mayslake's motion, the trial court dismissed with prejudice the plaintiff's claims under title I of the Electronic Communications Privacy Act of 1986 (18 U.S.C. § 2510 et seq. (2006)), under the Illinois eavesdropping statute (720 ILCS 5/14-1 et seq. (West 2008)), and for intentional infliction of emotional distress. The trial court also dismissed, without prejudice, the plaintiff's claim for intrusion upon seclusion, on the ground that the court could not assess whether the plaintiff's privacy had indeed been intruded upon without seeing the 36 e-mail printouts, which were not attached to the complaint. The plaintiff then filed a verified amended complaint against Mayslake and "unknown persons," reasserting the two claims currently before usintrusion upon seclusion and a claim under the Stored Communications Actand attaching the printouts of the e-mails.
¶ 21 Mayslake moved to strike the plaintiff's verification of her complaints and the trial court granted the motion. On October 14, 2009, Mayslake filed an unverified answer to the amended complaint. The parties commenced discovery. On December 18, 2009, Mayslake mailed to the plaintiff's attorney its answers to written interrogatories, in which for the first time it identified Frigo and Maxwell as having been involved in the accessing of the plaintiff's e-mails. In April 2010, the discovery depositions of Frigo and Maxwell were taken. The plaintiff then sought leave to file a second amended complaint adding Frigo and Maxwell as defendants but leaving the substance of her claims unchanged. The trial court granted the motion, and the plaintiff filed the second amended complaint on May 24, 2010. The same attorneys representing Mayslake (who had also represented Frigo and Maxwell at their depositions) filed an appearance on behalf of Frigo and Maxwell.
¶ 22 Over the next few months, the defendants filed two motions. Mayslake filed a motion for summary judgment under section 2-1005 of the Code of Civil Procedure (the Code) (735 ILCS 5/2-1005 (West 2008)), arguing that Frigo's and Maxwell's deposition testimony established that they did not act with wrongful intent and thus the plaintiff could not prove either of her claims against Mayslake. (Mayslake also argued that the suit was barred by the statute of limitations, but it later admitted that it had gotten its dates wrong and withdrew that argument.) Frigo and Maxwell filed, pursuant to section 2-619 of the Code (735 ILCS 5/2-619 (West 2008)), a motion to dismiss the complaint as to them on the basis that the claims against them were untimely, because the second amended complaint had been filed over a year after the statute of limitations expired. The plaintiff responded to the motion for summary judgment by pointing to evidence *38 that, she argued, raised a question of fact as to Frigo's and Maxwell's intent. As to the motion to dismiss, she argued that her second amended complaint "related back" to the date she filed the original complaint under section 2-616(d) of the Code (735 ILCS 5/2-616(d) (West 2008)).
¶ 23 The trial court heard argument on the two motions and granted both of them, stating as follows:
"Okay. Well, Iafter reading the case law, reading youryour papers, hearing the argument, first of all, II don't think that the plaintiff has accurately or substantially, or in any way, replied to the defendant's position with respect to intent. II find, as a matter of fact, that it is more likely an accident than than that there's an intention. So summary judgment is granted
[interjection by the defendants' attorney]
toMayslake.
* * *
With respect to the statute of limitations, it's crystal clear to me that Mr. Frigo's involvement was known to your client well before thethe lawsuit was filed, before he was named in the lawsuit, so the statute of limitations apply [sic]. With respect to Ms. Maxwell it's a little more difficult, but frankly, I don'tI don't find that the action was brought timely with respect to her either, so the motions are granted with respect to
[interjection by the defendants' attorney]
all of them."
The plaintiff filed a timely notice of appeal.

¶ 24 ANALYSIS

¶ 25 The Motion for Summary Judgment: Intent
¶ 26 On appeal, the plaintiff argues that both of the trial court's rulings were in error and that neither Mayslake's motion for summary judgment nor the individual defendants' motion to dismiss should have been granted. We begin by addressing the motion for summary judgment.
¶ 27 A motion for summary judgment is properly granted where the pleadings, depositions, admissions, and affidavits establish that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2008); Farmers Automobile Insurance Ass'n v. Williams, 321 Ill.App.3d 310, 314, 254 Ill.Dec. 231, 746 N.E.2d 1279 (2001). A triable issue precluding summary judgment exists where material facts are disputed or where the material facts are undisputed but reasonable persons might draw different inferences from the undisputed facts. Adams v. Northern Illinois Gas Co., 211 Ill.2d 32, 43, 284 Ill.Dec. 302, 809 N.E.2d 1248 (2004). We review the grant of summary judgment de novo. Ioerger v. Halverson Construction Co., 232 Ill.2d 196, 201, 327 Ill.Dec. 524, 902 N.E.2d 645 (2008).
¶ 28 We begin by noting that the trial court acted improperly when it stated that it found "as a matter of fact" that the accessing of the plaintiff's e-mails by Mayslake's employees was "more likely an accident" rather than intentional. In doing so, the trial court made a factual finding on one of the principal disputed issues in the case, a course that is inappropriate when the question is whether to grant summary judgment. "The purpose of summary judgment is to determine whether a genuine issue of material fact exists, not to try a question of fact." Thompson v. Gordon, 241 Ill.2d 428, 438, 349 Ill.Dec. 936, 948 N.E.2d 39 (2011). Nevertheless, because our review is de novo, we leave this error aside and simply consider *39 whether the plaintiff established that a question of material fact exists.
¶ 29 Mayslake argues that it was entitled to summary judgment because it produced evidencethe deposition testimony of Frigo and Maxwellthat those persons did not intentionally access the plaintiff's e-mails, and the plaintiff produced no contrary testimony or affidavits. Therefore, Mayslake argues, the plaintiff cannot prevail on either of her claims, both of which require the plaintiff to show intent. See Cardinal Health 414, Inc. v. Adams, 582 F.Supp.2d 967, 976 (M.D.Tenn.2008) (violation of Stored Communications Act occurs when a person intentionally and without authorization accesses another's e-mail stored on a server); Busse v. Motorola, Inc., 351 Ill.App.3d 67, 71, 286 Ill.Dec. 320, 813 N.E.2d 1013 (2004) (intrusion upon seclusion occurs when one person intentionally intrudes upon the solitude or seclusion of another in a manner that would be highly offensive to a reasonable person). Mayslake further emphasizes that "intent" in the context of the Stored Communications Act means more than voluntarily performing the actions necessary to access the stored communications of another. Rather, gaining such access must have been the defendant's conscious objective. Butera & Andrews v. International Business Machines Corp., 456 F.Supp.2d 104, 109-10 (D.D.C.2006). Mayslake argues that, because it was entitled to check the food service computer (one of its own "technology resources" under its policy on employees' computer use) and Maxwell testified that she thought the AOL icon displayed on that computer's screen could have been a work-related account, it did not intentionally access the plaintiff's e-mails.
¶ 30 A party's intent when acting is a question of fact. See People v. Cardamone, 232 Ill.2d 504, 517, 328 Ill.Dec. 917, 905 N.E.2d 806 (2009) (defendant's argument regarding his intent presented a question of fact); Schroeder v. Winyard, 375 Ill.App.3d 358, 364, 313 Ill.Dec. 740, 873 N.E.2d 35 (2007) (bankruptcy discharge case; whether act was willful and malicious was question of fact); Palmateer v. International Harvester Co., 140 Ill. App.3d 857, 860, 95 Ill.Dec. 253, 489 N.E.2d 474 (1986) (listing a broad range of cases holding that intent is a question of fact, including holdings on retaliatory discharge, fraud, easements, and trust construction). As summary judgment must be reserved for cases in which there is no question of material fact (735 ILCS 5/2-1005(c) (West 2008)), it generally should not be used when a party's intent is a central issue in the case (Schroeder, 375 Ill.App.3d at 368, 313 Ill.Dec. 740, 873 N.E.2d 35). Indeed, we have repeatedly held that "`summary judgment is particularly inappropriate where the inferences which the parties seek to have drawn deal with questions of motive, intent[,] and subjective feelings and reactions.'" Williams, 321 Ill.App.3d at 314, 254 Ill.Dec. 231, 746 N.E.2d 1279 (quoting Raprager v. Allstate Insurance Co., 183 Ill.App.3d 847, 859, 132 Ill.Dec. 224, 539 N.E.2d 787 (1989)). Nevertheless, even factual matters may be decided via summary judgment if the movant puts forward evidence as to a material fact that would entitle it to judgment and the nonmovant does not counter by pointing to contrary evidence. Schroeder, 375 Ill. App.3d at 368, 313 Ill.Dec. 740, 873 N.E.2d 35.
¶ 31 In this case, the plaintiff had no direct evidence of why Frigo and Maxwell acted as they did in accessing, printing, and sharing her personal e-mails; she could not read their minds. However, intent may be gleaned from circumstances and actions, not simply words. Thomas v. Koe, 395 Ill.App.3d 570, 582, 338 Ill.Dec. *40 567, 924 N.E.2d 1093 (2009). Indeed, actions may be better evidence of a person's intent than his or her declarations. Stein v. County Board of School Trustees, 40 Ill.2d 477, 480, 240 N.E.2d 668 (1968) ("Intent is gathered primarily from the acts of a person."); see also Schroeder, 375 Ill. App.3d at 368, 313 Ill.Dec. 740, 873 N.E.2d 35 ("in determining intent, a person's declarations of intent are entitled to less weight than his or her actions demonstrating intent").
¶ 32 In opposing the motion for summary judgment, the plaintiff pointed to Frigo's and Maxwell's testimony that they were aware of the plaintiff's sexual harassment allegations against Frigo at the time the e-mails were accessed. In addition, Maxwell testified that she knew that the plaintiff used Comcast for work-related purposes, yet she not only clicked on the AOL icon to open that e-mail account, she made the further decision to open and read part or all of the individual e-mails she saw in the plaintiff's in-box. She then made the further decision to print 36 of the e-mails, none of which had to do with the ostensible purpose of her e-mail investigations, i.e., looking for business-related communications about food orders, vendor accounts, special event plans, and the like. The evidence also permits the inference that Maxwell did not stop with viewing the plaintiff's e-mail in-box (the first screen that Maxwell testified she saw in the AOL account) and opening and reading the messages she saw there, but that Maxwell also explored further to find e-mails that the plaintiff had sentthe great majority of the 36 e-mails Maxwell printed were sent by the plaintiff, not to her. It is undisputed that some of the e-mails that Maxwell decided to print bore subject lines such as "hello," "Re: mom," "Fwd: FW: Fwd: Coffee and Sex," and "Fwd: David Copperfield]cooltry itart(UNBELIEVABLE)," which might suggest to a reasonable person that the content of the e-mails was not work-related. By contrast, Maxwell did not print out any of the "boatloads" of food-service-related e-mails that she encountered when she checked the plaintiff's Comcast account. When Frigo received the e-mail printouts from Maxwell, he read through some of them (highlighting and making written comments on at least one) and then shared them with Dreffein and Mayslake's attorneys rather than destroying them, despite his conclusion that the e-mails were personal and not work-related. Finally, those attorneys, acting as Mayslake's agents, then attached copies of the e-mails to Mayslake's response filed in the sexual harassment proceeding.[2]
*41 ¶ 33 All of this circumstantial evidence is sufficient to raise an issue of the credibility of Frigo's and Maxwell's statements about their intent with respect to the accessing, printing, and sharing of the plaintiff's personal e-mails, and such credibility issues are properly resolved by the trier of fact. Mayslake argues, however, that not all of this evidence is relevant to the question of whether Maxwell acted intentionally under the Stored Communications Act, because that statute prohibits only the narrow act of accessing another's stored communications (e.g., e-mails) through a "facility" such as an Internet service provider. 18 U.S.C. § 2701(a)(2006); Cardinal Health, 582 F.Supp.2d at 976.
¶ 34 Mayslake is correct that the Stored Communications Act is concerned with the unauthorized accessing of another's stored communications, not with the later disclosure or use of those communications. Cardinal Health, 582 F.Supp.2d at 976. However, even with this narrow focus in mind, some of the evidence outlined above is relevant to assessing whether Maxwell intended to access the plaintiff's personal emails. For instance, Maxwell knew that the plaintiff used a Comcast account for work, yet she nevertheless chose to click on the AOL icon, a fact that calls into question her assertions of an innocent motive for accessing that AOL account. The fact that Maxwell knew of the plaintiffs sexual harassment charges against her employer is also relevant to the issue of intent: conduct is "more likely to be intentional when it serves a party's self-interest to engage in such conduct." In re Pharmatrak, Inc., 329 F.3d 9, 23 (1st Cir.2003). And, although the initial accessing of the AOL account could be viewed as innocent if Maxwell had immediately logged out of the account once she had seen that the in-box contained material not clearly related to work, that is not what happened here. Maxwell deliberately chose to click additional times to travel from the first screen she viewed, the in-box, to the portion of the AOL account displaying e-mails that the plaintiff had sent, actions that could be viewed as additional acts of "accessing" the plaintiffs emails through the AOL "facility." Cf. Tapley v. Collins, 41 F.Supp.2d 1366, 1372-73 (S.D.Ga.1999)(although officer did not violate title I of the Electronic Communications Privacy Act when he initially intercepted private telephone call through random use of his scanner, he acted intentionally within the meaning of that statute when he continued listening even after he realized that it was a private telephone call), rev'd in part on other grounds, 211 F.3d 1210 (11th Cir.2000). We note that other courts interpreting the Stored Communications Act have stated that the type of evidence presented here is more than sufficient to withstand a motion for summary judgment (see Jennings v. Jennings, 389 S.C. 190, 697 S.E.2d 671, 675 (App.2010) (citing Fischer v. Mt. Olive Lutheran Church, Inc., 207 F.Supp.2d 914, 924-26 (W.D.Wis.2002))), and in some cases could even justify granting summary judgment in the plaintiffs favor (see Cardinal Health, 582 F.Supp.2d at 976 ("where the facts indisputably present a case of an individual logging onto another's e-mail account without permission and reviewing the material therein, a summary judgment finding of an SCA [Stored Communications Act] violation is appropriate") (citing Wyatt Technology Corp. v. Smithson, No. CV 05-1309 DT(RZx), 2006 WL 5668246, *9-10 (C.D.Cal. Aug. 14, 2006))). *42 Finally, the Stored Communications Act claim is not the plaintiffs only claim. The other evidence discussed above, relating to Maxwell's, Frigo's, and Dreffein's later sharing and use of the plaintiffs e-mails, is relevant to the intrusion upon seclusion claim. For all of these reasons, we find that there is a genuine issue of material fact regarding the intent of Mayslake's employees, and we therefore reverse the trial court's entry of summary judgment in favor of Mayslake.

¶ 35 The Motion to Dismiss: Section 2-616(d)
¶ 36 We next address the trial court's dismissal of the individual defendants, Frigo and Maxwell, from the suit. Before we delve into this issue, we must pause to consider a jurisdictional matter raised by the defendants. In her notice of appeal, the plaintiff stated that she was appealing from the order entered "on November 17, 2010 granting Defendants' Motion for Summary Judgment." The defendants point out that, although the November 17 order also granted their motion to dismiss, the plaintiff did not specifically refer to that portion of the order. Therefore, they argue, this court acquired jurisdiction to review only the grant of summary judgment and not their dismissal from the action.
¶ 37 Our supreme court has applied a broad standard in determining whether a notice of appeal confers jurisdiction on the appellate court:
"[A] notice of appeal is to be liberally construed. The notice of appeal serves the purpose of informing the prevailing party in the trial court that the unsuccessful litigant seeks a review by a higher court. Briefs, and not the notice of appeal itself, specify the precise points to be relied upon for reversal. Courts in this State and the Federal courts have repeatedly held that a notice of appeal will confer jurisdiction on an appellate court if the notice, when considered as a whole, fairly and adequately sets out the judgment complained of and the relief sought so that the successful party is advised of the nature of the appeal. [Citations.] Unless the appellee is prejudiced thereby, the absence of strict technical compliance with the form of the notice is not fatal, and where the deficiency in the notice is one of form only, and not of substance, the appellate court is not deprived of jurisdiction." Burtell v. First Charter Service Corp., 76 Ill.2d 427, 433-34, 31 Ill.Dec. 178, 394 N.E.2d 380 (1979).
See also People v. Smith, 228 Ill.2d 95, 104, 319 Ill.Dec. 373, 885 N.E.2d 1053 (2008) (reiterating these principles).
¶ 38 Applying these principles here, we must begin by considering the notice of appeal as a whole. In addition to identifying the order being appealed from as the order entered "on November 17, 2010 granting Defendants' Motion for Summary Judgment," the notice of appeal also stated that the appeal was "premised upon manifest errors by the trial court in the rendering of said Order and all underlying orders thereto," and the relief sought was "that the aforementioned Order be reversed and/or vacated by the Appellate Court, and, if necessary, that this cause be remanded to the trial court with directives consistent with such disposition." Construing the notice liberally, as we must (Smith, 228 Ill.2d at 104, 319 Ill.Dec. 373, 885 N.E.2d 1053), we find that this language fairly apprised the defendants that the plaintiff was seeking review (and reversal) of the entire order entered on the specified date. We also note that we must consider whether the defendants would be prejudiced by construing the notice in this manner. Id. at 105, 319 Ill.Dec. 373, 885 N.E.2d 1053. Here, in contrast to the case *43 they rely upon (Alpha Gamma Rho Alumni v. People ex rel. Boylan, 322 Ill.App.3d 310, 313, 255 Ill.Dec. 701, 750 N.E.2d 282 (2001)), the defendants do not assert that they would suffer any prejudice from our consideration of the motion to dismiss. See Knapp v. Bulun, 392 Ill.App.3d 1018, 1023, 331 Ill.Dec. 720, 911 N.E.2d 541 (2009) (where defendants did not assert that they would be prejudiced, court had jurisdiction to consider issue not specifically identified in notice of appeal). In fact, they did not raise the jurisdictional objection until they filed their responsive brief in the appeal, in which they also argued at length the merits of the dismissal's correctness. We therefore find that the notice of appeal in this case was sufficient to confer jurisdiction over all matters addressed in the trial court's order of November 17, 2010, including its dismissal of Frigo and Maxwell from the case. We therefore turn to the issue of whether that dismissal was correct.
¶ 39 The motion to dismiss was brought pursuant to section 2-619 of the Code (735 ILCS 5/2-619 (West 2008)), under which the allegations of a complaint are taken as true but the defendant asserts an affirmative defense or other matter that would defeat the plaintiff's claim. 735 ILCS 5/2-619 (West 2008); Nielsen-Massey Vanillas, Inc. v. City of Waukegan, 276 Ill.App.3d 146, 151, 212 Ill.Dec. 856, 657 N.E.2d 1201 (1995). The affirmative defense asserted here was the statute of limitations. Frigo and Maxwell contend (and the plaintiff does not dispute) that the limitations period for both of her claims was two years and that the limitations period expired at the latest in September 2009, two years after the plaintiff learned of the accessing of her e-mails. The plaintiff filed her original complaint naming Mayslake and "unknown defendants" within this period, but her second amended complaint naming Frigo and Maxwell as additional defendants was not filed until May 2010, after the period had expired. The parties dispute whether the filing of the second amended complaint "relates back" to the original complaint's filing date pursuant to section 2-616(d) of the Code (735 ILCS 5/2-616(d) (West 2008)) such that the claims against Frigo and Maxwell would be considered timely. "Section 2-619 motions present a question of law, and we review rulings thereon de novo." DeLuna v. Burciaga, 223 Ill.2d 49, 59, 306 Ill.Dec. 136, 857 N.E.2d 229 (2006).
¶ 40 Section 2-616(a) of the Code permits a pleading to be amended "on just and reasonable terms" "[a]t any time before final judgment," and specifically allows the joining of "any party who ought to have been joined as plaintiff or defendant." 735 ILCS 5/2-616(a) (West 2008). Subsection (d) of that section provides for a suspension of the statute of limitations that would normally apply to claims against a newly added party, under certain circumstances:
"A cause of action against a person not originally named a defendant is not barred by lapse of time under any statute or contract prescribing or limiting the time within which an action may be brought or right asserted, if all the following terms and conditions are met: (1) the time prescribed or limited had not expired when the original action was commenced; (2) the person, within the time that the action might have been brought * * * against him or her[,] plus the time for service permitted under Supreme Court Rule 103(b), received such notice of the commencement of the action that the person will not be prejudiced in maintaining a defense on the merits and knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought *44 against him or her; and (3) it appears from the original and amended pleadings that the cause of action asserted in the amended pleading grew out of the same transaction or occurrence set up in the original pleading * * *. For the purpose of preserving the cause of action under those conditions, an amendment adding the person as a defendant relates back to the date of the filing of the original pleading so amended." 735 ILCS 5/2-616(d) (West 2008).
The plaintiff contends that all three of the statute's requirements are met here, and so the claims against Frigo and Maxwell stated in the second amended complaint relate back to the date when she filed her initial complaint and thus are timely.
¶ 41 Frigo and Maxwell do not dispute that the first and third requirements for relation backthat the original complaint was timely, and that the claims brought against them in the second amended complaint grew out of the same occurrence as the claims in the original complaintare met. Instead, they raise three other arguments. First, they argue that, taking as true the plaintiff's contention that she did not know for sure until shortly before she filed her second amended complaint that Frigo and Maxwell were involved in the alleged misconduct, section 2-616(d) does not apply because it covers only cases in which the plaintiff made a mistake about the identity of the proper defendants, not cases in which the plaintiff's failure to name all of the defendants in her initial complaint was due to a lack of knowledge. Second, they argue that, even if section 2-616(d) applies to this case, the second requirement for relation back was not met as to Maxwell because she learned about the suit only a few days before her deposition, outside of the statutory time period. Finally, they argue that the relation-back doctrine cannot be applied to the claim against Frigo because in fact the plaintiff knew before she filed suit that Frigo was involved in the accessing of her e-mails, and thus there was no excuse for her failure to name him as a defendant in the original complaint.
¶ 42 The relation-back doctrine contained in section 2-616(d) has been in existence for many years. For much of that time it required the plaintiff to show, among other things, that the failure to name the new defendant in the initial complaint was "inadvertent." 735 ILCS 5/2-616(d) (West 1992) (previously codified at Ill.Rev.Stat.1983, ch. 110, ¶ 2-616(d), and Ill.Rev.Stat.1967, ch. 110, ¶ 46(4)). The focus in many of the cases applying the doctrine was thus on what the plaintiff knew or should have known at the time the complaint was filed and the plaintiff's diligence in seeking to amend the complaint. See, e.g., Evans v. Graber, Inc., 115 Ill. App.3d 532, 535-36, 71 Ill.Dec. 47, 450 N.E.2d 482 (1983). In 2002, however, the General Assembly amended section 2-616(d), eliminating the inadvertence requirement. Examining the legislative history of the amendment, this court concluded that the amendment was intended to "bring [section 2-616(d) of] the Code into line with" Rule 15(c) of the Federal Rules of Civil Procedure (Fed.R.Civ.P. 15(c)). Compton v. Ubilluz, 351 Ill.App.3d 223, 233, 285 Ill.Dec. 346, 811 N.E.2d 1225 (2004). The language of the amended section 2-616(d) is substantially similar to that of Rule 15(c), which provides that an amended pleading naming a new party will relate back to the filing date of the original pleading if the claims or defenses asserted in the amended pleading are the same as those in the original and, within the limitations period for the claim plus the time allowed for service of the pleading, the new party (1) "received such notice of the action that it will not be prejudiced in defending on the merits," and (2) "knew or *45 should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." Fed.R.Civ.P. 15(c)(1)(C).
¶ 43 The first argument raised by Frigo and Maxwell centers on the word "mistake" as it is used in one portion of the second requirement for relation back under section 2-616(d): the requirement that the person sought to be added "knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against him or her." (Emphasis added.) 735 ILCS 5/2-616(d) (West 2008). Frigo and Maxwell argue that the relation-back doctrine expressed in section 2-616(d) does not apply here because the plaintiff's failure to name them as defendants in her original complaint was not due to a mistake about their identities. They point out that much of the case law applying section 2-616(d) involves what might be termed the classic mistaken identity scenario: a case in which party A commits the alleged misconduct, but the plaintiff sues party B, not realizing that party A (the proper defendant) is a different person or entity, and does not discover the mistake until later. The plaintiff concedes that she does not fall within this fact pattern. (The plaintiff says that the reason she did not name Frigo and Maxwell at first was that she did not know for sure how they were involved in the accessing and sharing of her personal e-mails, facts that she learned only after receiving Mayslake's answers to interrogatories and taking the depositions of Frigo and Maxwell.) However, the plaintiff contends that the relation-back doctrine nevertheless applies here, because this situation falls within the definition of a "mistake concerning the identity of the proper party" under section 2-616(d).
¶ 44 The question of whether the facts of this case constitute a "mistake concerning the identity of the proper party" requires us to construe the language of section 2-616(d). In construing a statute, our task is to "ascertain and give effect to the legislature's intent." Lieb v. Judges' Retirement System of Illinois, 314 Ill.App.3d 87, 92, 247 Ill.Dec. 36, 731 N.E.2d 809 (2000). The best indicator of the legislature's intent is the plain language of the statute. Lee v. John Deere Insurance Co., 208 Ill.2d 38, 43, 280 Ill.Dec. 523, 802 N.E.2d 774 (2003). "When the statute's language is clear, it will be given effect without resort to other aids of statutory construction." Id.
"However, if a statute is capable of being understood by reasonably well-informed persons in two or more different ways, the statute will be deemed ambiguous. Landis v. Marc Realty, L.L.C., 235 Ill.2d 1, 11, 335 Ill.Dec.581, 919 N.E.2d 300 (2009). If the statute is ambiguous, the court may consider extrinsic aids of construction in order to discern the legislative intent. [Id.] We construe the statute to avoid rendering any part of it meaningless or superfluous. Blum [v. Koster], 235 Ill.2d [21,] 29, 335 Ill.Dec. 614, 919 N.E.2d 333 [(2009)]. * * *
We may also consider the consequences that would result from construing the statute one way or the other. Landis, 235 Ill.2d at 12, 335 Ill.Dec. 581, 919 N.E.2d 300. In doing so, we presume that the legislature did not intend absurd, inconvenient, or unjust consequences. [Id.]" Solon v. Midwest Medical Records Ass'n, 236 Ill.2d 433, 440-41, 338 Ill.Dec. 907, 925 N.E.2d 1113 (2010).
In addition, in construing section 2-616(d) we must interpret its language liberally, bearing in mind the jurisprudential policy that claims should be decided on their merits if possible. "This policy * * * suggests that we should select a construction *46 of [section 2-616(d)] that would lead to a resolution on the merits." Compton, 351 Ill.App.3d at 233, 285 Ill.Dec. 346, 811 N.E.2d 1225.
¶ 45 Where a provision of the Illinois Code of Civil Procedure is patterned after a Federal Rule of Civil Procedure, federal cases interpreting the federal rule are persuasive authority with regard to the application of the Illinois provision. Cruz v. Unilock Chicago, Inc., 383 Ill.App.3d 752, 761, 322 Ill.Dec. 831, 892 N.E.2d 78 (2008); see also Maggi v. RAS Development, Inc., 2011 IL App (1st) 091955, ¶¶ 28-33, 37-40, 350 Ill.Dec. 939, 949 N.E.2d 731 (applying federal case law to issues arising under section 2-616(d)). There is little Illinois case law applying the amended version of section 2-616(d), and virtually none addressing the issue of whether the section can be applied to a situation in which the plaintiff's initial failure to name a defendant within the limitations period was due to a lack of knowledge about the defendant, rather than an incorrect impression about the identity of the defendant. By contrast, federal courts have been applying the current version of Rule 15(c) since 1993, and thus there is a substantially greater body of federal case law on the issue. Accordingly, we look beyond Illinois law to consider federal case law in our analysis.
¶ 46 Before last year, the federal courts of appeals were divided as to whether the relation-back doctrine embodied in Rule 15(c) could be applied to situations outside of the quintessential case of misnomer or mistaken identity. The majority of the courts held that the requirements for relation back under Rule 15(c) included not only that the defendant knew about the suit within the statutory time and would not be prejudiced by being added to the suitthe requirements of subsections (i) and (ii) of the rulebut also an independent requirement that the failure to name the new defendant earlier must have been the result of a "mistake." These courts interpreted that term narrowly, holding that a plaintiff's lack of knowledge about the identity of individual defendants was not a "mistake" within the meaning of Rule 15(c). See, e.g., King v. One Unknown Federal Correctional Officer, 201 F.3d 910, 914 (7th Cir.2000); Jacobsen v. Osborne, 133 F.3d 315, 321 (5th Cir.1998); Rendall-Speranza v. Nassim, 107 F.3d 913, 919 (D.C.Cir.1997); Barrow v. Wethersfield Police Dept., 66 F.3d 466, 468 (2d Cir.1995).
¶ 47 However, some courts rejected that analysis. In Goodman v. Praxair, Inc., 494 F.3d 458, 467 (4th Cir.2007), the Fourth Circuit noted that Rule 15(c)'s requirements "reflect a subtle and complex compromise of two competing policies": the policy favoring the liberal amendment of pleadings to enable a just determination on the merits, and the policy supporting allowing defendants repose after a certain period of time so that they are not prejudiced by having to defend against stale claims when the testimony or other evidence they need for their defense is no longer available. "In light of these policies, Rule 15(c) must be understood to freely permit amendment of pleadings and their relation-back so long as the policies of statutes of limitations have been effectively served. [Citation.] And that is accomplished in Rule 15(c) by requiring that a new party have had adequate notice within the limitations period and by assuring that the new party not be prejudiced by the passage of time between the original pleading and the amended pleading." Id. at 468.
¶ 48 The Fourth Circuit then directly addressed the defendants' contention that Rule 15(c) referred to a "mistake" by the plaintiff and that the only types of mistake *47 encompassed by the rule were those involving corporate identity or misnomer, not mistakes based upon a lack of knowledge. The court held that, contrary to the defendants' argument, the term "mistake" in Rule 15(c) serves only as a general description of the type of knowledge that the new defendant must possess, that is, the knowledge that he or she would have been named in the original complaint if not for a mistake by the plaintiff. As such, the term alludes "by implication to a circumstance where the plaintiff makes a mistake in failing to name a party, in naming the wrong party, or in misnaming the party in order to prosecute his claim as originally alleged." Id. at 470. Construing the term "mistake" in this manner "serves the policies of freely allowing amendment and at the same time preserving to new parties the protections afforded by statutes of limitations." Id. The court commented that it was aware of contrary decisions by other courts of appeal, but that the language of Rule 15(c) did not support the construction adopted in those cases, and decisions of the First and Third Circuits were in accord with the Fourth Circuit on the issue. See Arthur v. Maersk, Inc., 434 F.3d 196, 208 (3d Cir.2006) ("A `mistake' is no less a `mistake' when it flows from lack of knowledge as opposed to inaccurate description."); Leonard v. Parry, 219 F.3d 25, 28-29 (1st Cir.2000) (a plaintiff's knowledge regarding the proper defendant's identity was not relevant to whether she made a "mistake concerning the identity of the proper party").
¶ 49 In Krupski v. Costa Crociere S.p.A., 560 U.S. ___, 130 S.Ct. 2485, 177 L.Ed.2d 48 (2010), the Supreme Court addressed the split among the federal courts of appeal on this very issue. Id. at ___, 130 S.Ct. 2485 at 2492-93. In Krupski, the plaintiff, a passenger on a cruise ship who sustained an injury onboard, brought suit against Costa Cruise Lines, the entity whose Florida address was listed on the front of the ticket and that was identified on the back of the ticket as the sales agent and the issuer of the ticket. However, the plaintiff failed to name Costa Crociere S.p.A., identified on the back of the ticket as the carrier. The complaint, filed shortly before the statute of limitations expired, alleged that Costa Cruise Lines owned, operated, managed, supervised, and controlled the ship on which the plaintiff was injured. After the limitations period had run, Costa Cruise Lines filed an answer and provided other information over the next few months identifying Costa Crociere as the owner and operator of the ship. The plaintiff did not file an amended complaint naming Costa Crociere until approximately five months after the initial complaint. The trial court dismissed the amended complaint on the ground that it was untimely and the Eleventh Circuit affirmed in an unpublished per curiam opinion. The court of appeals held that the amended complaint did not relate back to the filing date of the original complaint, because the plaintiff knew or should have known the correct defendant's identity based on the information contained on her ticket, and thus her naming of Costa Cruise Lines should be treated as a deliberate decision, not a "mistake" under Rule 15(c). Moreover, the plaintiff had not been diligent in seeking to amend her complaint. Id. at ___, 130 S.Ct. at 2492.
¶ 50 The Supreme Court began by rejecting, as inconsistent with Rule 15(c)'s focus, the Eleventh Circuit's conclusion that the plaintiff had not made a "mistake" within Rule 15(c) because she either knew or should have known of the correct defendant's identity before she filed suit: "Rule 15(c)(1)(C)(ii) asks what the prospective defendant knew or should have known during the [relevant] period, not what the plaintiff knew or should have known at the *48 time of filing her original complaint." (Emphases in original.) Id. at ___, 130 S.Ct. at 2493. The Court held that the plaintiff's knowledge or conduct had little relevance in determining whether a claim related back and refused to construe narrowly the reference to "a mistake concerning the proper party's identity." Fed. R.Civ.P. 15(c)(1)(C)(ii). Rather, the Court defined the term "mistake" broadly to include not only an error or misconception, but also "a misunderstanding of the meaning or implication of something" or "a wrong action or statement proceeding from faulty judgment, inadequate knowledge, or inattention." (Internal quotation marks omitted and emphasis added.) Id. at ___, 130 S.Ct. at 2494 (quoting Webster's Third New International Dictionary 1446 (2002)).
¶ 51 The Court explained that its broad interpretation of the term "mistake" to include a deliberate but mistaken choice by a plaintiff was necessary to give effect to the purpose of the relation-back doctrine:
"This reading is consistent with the purpose of relation back: to balance the interests of the defendant protected by the statute of limitations with the preference expressed in the Federal Rules of Civil Procedure in general, and Rule 15 in particular, for resolving disputes on their merits. [Citations.] A prospective defendant who legitimately believed that the limitations period had passed without any attempt to sue him has a strong interest in repose. But repose would be a windfall for a prospective defendant who understood, or who should have understood, that he escaped suit during the limitations period only because the plaintiff misunderstood a crucial fact about his identity." Id. at ___, 130 S.Ct. at 2494.
The Court acknowledged that Rule 15(c) would not apply where there was no mistake at all, but described that circumstance as existing only where "the original complaint and the plaintiff's conduct compel the conclusion that the failure to name the prospective defendant in the original complaint was the result of a fully informed decision." Id. at ___, 130 S.Ct. at 2496. In Krupski, however, the allegations of the complaint made it clear that the plaintiff meant to sue the company that owned and operated the ship on which she was injured, and thus her failure to do so was a mistake. Id. at ___, 130 S.Ct. at 2497. Finally, the Court rejected the idea that the plaintiff's diligence in seeking to amend the complaint was relevant to relation back under Rule 15(c): "The Rule plainly sets forth an exclusive list of requirements for relation back, and the amending party's diligence is not among them." Id. at ___, 130 S.Ct. at 2496.
¶ 52 Krupski caused both federal and state courts to reevaluate their approach to relation back. "The only two inquiries that the district court is now permitted to make in deciding whether an amended complaint relates back to the date of the original one are, first, whether the defendant who is sought to be added by the amendment knew or should have known that the plaintiff, had it not been for a mistake, would have sued him instead or in addition to suing the named defendant; and second, whether, even if so, the delay in the plaintiff's discovering his mistake impaired the new defendant's ability to defend himself." Joseph v. Elan Motorsports Technologies Racing Corp., 638 F.3d 555, 559-60 (7th Cir.2011). In Maggi, 2011 IL App (1st) 091955, ¶¶ 28-33, 350 Ill.Dec. 939, 949 N.E.2d 731, a recent Illinois case, the appellate court similarly took its lead from Krupski and applied this same two-part analysis in deciding whether an amended complaint naming a different general contractor related back to the filing of the original complaint under section *49 2-616(d). We too conclude that the principles stated in Krupski apply equally here. With these principles in mind, we find that a lack of knowledge about the identity of all of those involved in the alleged wrongdoing qualifies as a "`mistake concerning the identity of the proper party'" for the purposes of the relation-back doctrine. See Krupski, 560 U.S. at ___, 130 S.Ct. at 2494 (defining "mistake" to encompass, among other things, "a wrong action or statement proceeding from * * * inadequate knowledge" (internal quotation marks omitted)); Arthur, 434 F.3d at 208 ("A `mistake' is no less a `mistake' when it flows from lack of knowledge * * *."). We therefore reject the defendants' argument and find that section 2-616(d) properly applies to this case, in which the plaintiff's failure to name Frigo and Maxwell in her initial complaint was a "mistake" derived from her lack of knowledge about the nature of their involvement.
¶ 53 The defendants next argue that, even if section 2-616(d) applies to this case, one of the requirements for relation backnotice of the suit within the limitations period plus the time for service under Illinois Supreme Court Rule 103(b) (eff. July 1, 2007)was not met as to Maxwell because according to her testimony she learned about the suit only a few days before her deposition. The defendants point out that Maxwell was deposed about seven months after the statute of limitations expired, and Illinois courts have generally held that "the time for service permitted under Supreme Court Rule 103(b)" is less than that. See, e.g., Lewis v. Dillon, 352 Ill.App.3d 512, 514, 287 Ill. Dec. 748, 816 N.E.2d 715 (2004). Thus, they argue, Maxwell did not, within the statutory period, "receive[] such notice of the commencement of the action that [she would] not be prejudiced in maintaining a defense on the merits." 735 ILCS 5/2-616(d) (West 2008). (Frigo testified that he saw the original complaint when it first came into the office, i.e., when it was served on Mayslake, and the defendants have not raised this particular argument as to him.)
¶ 54 The plaintiff argues that, even if Maxwell did not have actual notice of the suit until later, she had constructive or imputed knowledge because: she was employed by Mayslake (which had timely notice of the suit), the claims asserted against her are the same ones asserted against Mayslake, and she is represented by the same attorneys who have represented Mayslake since the beginning. The plaintiff notes that Maxwell and Frigo (whose arguments we examine later) do not argue that having been brought into the suit later prejudiced them in any way. The plaintiff argues that, as the notice to Maxwell was sufficient to ensure that she would not be prejudiced in her defense, it met the requirements of section 2-616(d) for relation back.
¶ 55 In considering whether a person had notice that he or she was an intended target of a lawsuit (or, in the words of section 2-616(d), "knew or should have known that, but for a mistake * * *, the action would have been brought against him or her"), we must look to both the allegations of the original complaint and the circumstances relating to notice, especially the relationship, if any, between the named defendant(s) and the prospective defendant. In Krupski, the Court examined (a) the allegations of the complaint, which made it clear that the plaintiff sought to sue the entity that owned and operated the ship on which she was injured, and (b) the parent-subsidiary relationship between the named defendant and the prospective defendant, in concluding that the prospective defendant received *50 timely notice of the suit. Krupski, 560 U.S. at ___, 130 S.Ct. at 2497. Additionally, in that case the prospective defendant was represented by the same attorney who had represented the original defendant throughout. Id. at ___, 130 S.Ct. at 2491.
¶ 56 Federal appeals courts have held that, where the named defendant and the prospective defendant are closely related and also share the same attorney, that attorney's knowledge of the suit may be imputed to the prospective defendant under certain circumstances. See Goodman, 494 F.3d at 475 ("when a plaintiff alleges a comprehensible claim against one of a group of closely related * * * business entities or corporations, the other entities in that group, barring a contrary showing, will be charged with knowledge" of the claim under the relation-back doctrine; also relying on the fact that the same attorney represented both); Singletary v. Pennsylvania Department of Corrections, 266 F.3d 186, 195 (3d Cir.2001) ("notice" for purposes of Rule 15(c) is not the same as service of a complaint, and may be satisfied by knowledge gained by informal means, so long as the knowledge is of the suit itself and not simply of the events underlying the suit; citing cases). When the notice is less formal, a court must be more concerned with whether that notice was sufficient to ensure that the prospective defendant would not be prejudiced by the delay in being added to the suit. "Prejudice and notice are closely intertwined in the context of Rule 15(c)(3), as the amount of prejudice a defendant suffers under 15(c)(3) is a direct effect of the type of notice he receives." Singletary, 266 F.3d at 194 n. 3.
¶ 57 The question of whether Maxwell may be said to have had timely notice of the suit is a close one. On the one hand, the claims against Maxwell are identical to those asserted against Mayslake; her actions in accessing, printing, and sharing the plaintiff's personal e-mails form much of the basis for Mayslake's potential liability; and there is sufficient identity of interest in this lawsuit between Mayslake and Maxwell such that Maxwell would suffer no prejudice to her ability to defend herself by being added to the lawsuit. (Indeed, as the plaintiff noted, neither of the individual defendants has raised prejudice as a ground for denying relation back.) Moreover, given the fact that the plaintiff included "unknown defendants" as parties to her suit and specifically identified in the allegations of her original complaint the very acts that Maxwell performed, and that Mayslake and its attorneys knew that Maxwell performed, it is clear that Mayslake knew that Maxwell was a potential defendant at the time the initial complaint was served. Similarly, if Maxwell had read the complaint she would or should have known that it related to her despite the fact that she was not initially named.
¶ 58 On the other hand, Maxwell testified that she did not know of the plaintiff's suit until shortly before her deposition, well outside of the statutory period. She also testified that she did not talk with Frigo about the suit until the morning of her deposition and did not help Frigo gather documents responsive to discovery requests earlier in the suit. Further, despite the fact that she was Frigo's administrative assistant and handled the mail for him, there is no evidence that she saw the original complaint when it was served. (The return of service stated that the complaint and summons were directed to Mayslake "c/o Larry Dreffein" and that a person named Sandy Graham accepted service at Mayslake's address.)
¶ 59 This evidence that Maxwell had no actual notice of the suit within the statutory period distinguishes this case from several of the cases in which the courts found *51 constructive or imputed notice, and makes it more closely resemble Garvin v. City of Philadelphia, 354 F.3d 215 (3d Cir.2003). In that case, the plaintiff sued the city and "Officer John Doe," alleging that unknown police officers injured her during an arrest; 2½ years later, the plaintiff sought to amend the complaint to add as defendants the individual police officers responsible for her injuries. The district court denied leave to amend and the appellate court affirmed on the ground that the individual officers did not have notice of the suit within the required period. The Third Circuit explained two variants of constructive noticenotice via sharing an attorney with a named defendant, and notice due to an identity of interestbut concluded that neither applied to the prospective defendants. Notice could not be imputed through the "shared attorney" theory, because there must be evidence that the common attorney actually communicated with the prospective defendants during the statutory period, and there was no evidence that the city's attorney had done so. Id. at 223-24. As for the identity of interest theory, it did not apply where the prospective defendants were nonmanagerial employees who would not necessarily have been aware of the suit. Id. at 227.
¶ 60 Similarly, Maxwell was a nonmanagerial employee whose awareness of the suit cannot be presumed from Mayslake's and Frigo's knowledge, and there is no evidence that she communicated with Mayslake's attorneys about the suit within the statutory period. The plaintiff argues that it would be reasonable to infer that Mayslake's attorneys spoke with Maxwell in the process of drafting Mayslake's answers to interrogatories (which were completed and served in December 2009, potentially within the statutory period), and thus Maxwell had timely notice of the suit. In those answers, Mayslake identified Maxwell as having been involved in accessing the plaintiff's e-mails. However, at oral argument Mayslake's attorney stated that the answers to the interrogatories were based only on Frigo's personal knowledge and that the attorneys did not communicate with Maxwell in the process of preparing them. Although Maxwell notarized Frigo's certification of the interrogatory answers, the notarization required her only to witness Frigo's signature, not read the answers themselves. Accordingly, we conclude that Maxwell did not have the required notice of the suit within the statutory period, and thus the second amended complaint was untimely as to her and did not relate back under section 2-616(d). The trial court did not err in dismissing the suit as to Maxwell.
¶ 61 The defendants' final argument is that the relation-back doctrine cannot be applied to the claim against Frigo either, because even before she filed suit the plaintiff knew that Frigo was involved in the accessing of her e-mails. They point to a letter written by the plaintiff in September 2007 to Dreffein's supervisor, in which she stated that she believed Frigo was involved in accessing her e-mails. Thus, they contend that she had no excuse for not naming Frigo as a defendant in her original complaint. In response, the plaintiff argues that her letter expressed only her suspicions, not the type of actual knowledge formed after reasonable investigation of her claim that is required under Illinois Supreme Court Rule 137 (eff.Feb.1, 1994) before a claim may be asserted. She argues that she acted reasonably and ethically in waiting until she had evidence of Frigo's involvement before naming him as a defendant. We need not address this dispute over the significance of the words used by the plaintiff in her letter because the legal theory on which the defendants' argument rests is flawed.
*52 ¶ 62 The defendants' argument is essentially that the plaintiff cannot use the harbor of relation back because she was not diligent in amending the complaint to name Frigo as a proper defendant. Diligence on the part of the plaintiff was required under the old version of section 2-616(d), which focused on whether the plaintiff's failure to name a defendant at the outset was "inadvertent." See Campbell v. Feuquay, 140 Ill.App.3d 584, 588, 94 Ill.Dec. 864, 488 N.E.2d 1111 (1986). However, as discussed above, the 2002 amendment to the statute eliminated this requirement. The purpose of the amendment was to bring the relation-back doctrine in Illinois law into harmony with the federal version of the doctrine, as expressed in Rule 15(c). Compton, 351 Ill. App.3d at 233, 285 Ill.Dec. 346, 811 N.E.2d 1225. The Supreme Court has emphatically rejected the argument that the plaintiff's diligence is relevant to the determination of whether, under Rule 15(c), an amended complaint naming a new defendant relates back to the timely filed claims. Krupski, 560 U.S. at ___, 130 S.Ct. at 2496. Just as with Rule 15(c), the emphasis in section 2-616(d) is on the defendant's knowledge and possible prejudice, not on the plaintiff's knowledge and conduct. 735 ILCS 5/2-616(d) (West 2008); see also Maggi, 2011 IL App (1st) 091955, ¶ 37, 350 Ill.Dec. 939, 949 N.E.2d 731. Moreover, the plaintiff's failure to name Frigo in her original complaint could not reasonably have misled Frigo into thinking that the omission was a deliberate legal strategy, in light of the fact that the plaintiff (1) included "unknown persons" as defendants in that complaint and (2) alleged that she intended to sue the persons involved in accessing and sharing her personal e-mails, once she knew who they were. See Krupski, 560 U.S. at ___, 130 S.Ct. at 2497 (rejecting a similar argument on the grounds that the defendant had "articulated no strategy that it could reasonably have thought [the plaintiff] was pursuing" in failing to name it in the original complaint). Accordingly, we must reject the defendants' argument relating to diligence. The defendants have raised no other arguments for why the plaintiff's claims against Frigo in her second amended complaint should not relate back to her original filing date. Accordingly, we find that those claims are timely and that the trial court erred in dismissing the second amended complaint as to Frigo. We therefore reverse the dismissal of the second amended complaint as to Frigo.

¶ 63 CONCLUSION
¶ 64 The judgment of the circuit court of Du Page County is affirmed in part and reversed in part. The grant of summary judgment in favor of Mayslake is reversed, as is the dismissal of the second amended complaint as to Frigo. The dismissal of the second amended complaint as to Maxwell is affirmed. The case is remanded for further proceedings.
¶ 65 Affirmed in part and reversed in part; cause remanded.
Presiding Justice JORGENSEN and Justice HUDSON concurred in the judgment and opinion.
NOTES
[1] One of the e-mail printouts displays the date "4/13/07" on a line of type near the bottom of the page in a manner suggesting that the e-mail was printed on that date (and thus probably accessed on that date). However, a similar line of type on the remaining printouts is cut off so that it is only partially visible or not visible at all, and there is no other evidence of the exact date on which the e-mails were accessed. The latest date on any of the e-mails' captions is April 11, 2007. Taking as true Maxwell's testimony that she accessed the plaintiff's account only once, we conclude that she must have done so on or after April 11.
[2] Mayslake argues that Maxwell reasonably continued to think that the AOL account could be work-related even after accessing the account, because "she testified that she specifically recalled seeing e-mails from Gordon Food Services on [the food service] computer." (Gordon Food Services is a vendor for Mayslake.) Mayslake is attempting to stretch Maxwell's testimony beyond its true nature here. In response to questions as to how the e-mails were displayed in the in-boxes of the accounts Maxwell accessed, she testified that the screen showed names that indicated the senders of the e-mails:

"Q. [Plaintiff's attorney]: Let's go back.
You said that what appeared was Date, Subject, and then it also showed a name like who sent it.
A. [Maxwell]: Correct. For example, Gordon Food Service, be [sic] Gordon Food Service."
This exchange is a far cry from evidence that Maxwell saw this vendor's name in the in-box of the plaintiff's personal AOL account. Maxwell did not testify that she actually saw the name of the vendor that she used as an example, nor is it even clear whether she was thinking of the AOL account or the Comcast account when she gave this example. The plaintiff's attorney engaged in similar exaggeration at oral argument by suggesting that Mayslake's answers to interrogatories identified Maxwell as a "defendant"; they did not. This type of fact-stretching argumentation, which is at best disingenuous and at worst an attempt to deliberately misrepresent the record, reflects extremely poorly on counsel for both parties and undermines rather than enhances their representation of their clients.